**LURIA BROTHERS AND COMPANY, Inc., et al., Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

Nos. 14402, 14411–14421, 14470–14472.

United States Court of Appeals Third Circuit.

Argued Jan. 21, 1966.

Decided Jan. 8, 1968.

Rehearing Denied Feb. 27, 1968.

**850**

Morris Wolf, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa. (Nathan Silberstein, Burton Caine, Philadelphia, Pa., on the brief), for Luria Brothers and Co., Inc., petitioner in No. 14402.

Albert R. Connelly, Cravath, Swaine & Moore, New York City (Edward C. Perkins, Daniel I. Davidson, New York City, on the brief), for Bethlehem Steel Corp. et al., petitioners in No. 14414.

Howard M. Holtzmann, Holtzmann, Wise & Shepard, New York City (Mark J. Maged, New York City, on the brief), for Colorado Fuel & Iron Corp. et al., petitioners in No. 14421.

James A. Bell, Thorp, Reed & Armstrong, Pittsburgh, Pa. (C. M. Thorp, Jr., Charles Weiss, Pittsburgh, Pa., Lewis Franklin Powell, Jr., Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on the brief), for National Steel Corp., petitioner in No. 14415, Edgewater Steel Co., petitioner in No. 14416 and for Weirton Sell Co., petitioner in No. 14472.

William H. Buchanan, General Atty., United States Steel Corporation Pittsburgh, Pa. (L. L. Lewis, Merrill Russell, Pittsburgh, Pa., on the brief), for U. S. Steel Corp., petitioner in No. 14417.

Joseph A. Vieson, W. Robert Chandler, Cross, Wrock, Miller, Vieson & Kelley, Detroit, Mich., for petitioner Detroit Steel Corp.

R. H. McRoberts, Edwin S. Taylor, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for petitioner Granite City Steel Co.

Robert C. McAdoo, Morgan, Lewis & Bockius, Philadelphia, Pa., for petitioner Baldwin-Lima-Hamilton Corp.

Gilbert W. Oswald, Samuel D. Slade, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for petitioner Lukens Steel Co.

Arnold F. Shaw, Donohue, Kaufmann & Shaw, Washington, D. C., for petitioner Phoenix Steel Corp., successor by merger to Phoenix Iron and Steel Co. and Central Iron and Steel Co.

Lester S. Clemons, William K. McKibbage, Quarles, Herriott & Clemons, Milwaukee, Wis., for petitioner Bucyrus-Erie Co.

Ralph M. Barley, Barley, Snyder, Cooper & Mueller, Lancaster, Pa., for petitioner Grinnell Corp., successor by merger to Columbia Malleable Castings Corp.

Dickinson, Wright, McKean & Cudlip, William B. Cudlip, T. Donald Wade, W. Gerald Warren, Detroit, Mich., for petitioner McLouth Steel Corp.

Frederick H. Mayer, Federal Trade Commission, Washington, D. C. (James McI. Henderson, General Counsel, J. B. Truly, Asst. General Counsel, David B. Morris, Attorney, Attorneys for Federal

Trade Commission, Washington, D. C., on the brief), for respondent in all cases.

## OPINION OF THE COURT

Before McLAUGHLIN, KALODNER and GANEY, Circuit Judges.

GERALD McLAUGHLIN, Circuit Judge.

Our decision in this appeal has been delayed because of litigation pending in the United States Supreme Court concerning the power of the Federal Trade Commission (Commission) to pass upon the merits of controversies before it during the period when the Commission was composed of only three of its five members and one of those three dissented. The Supreme Court has validated the hearing and decisional status of the Commission as constituted when it heard

and decided that case. Federal Trade Commission v. Flotill Products, Inc., 389 U.S. 179, 88 S.Ct. 401, 19 L.Ed.2d 398 (December 4, 1967). We have therefore considered and determined the matter before us on its merits.

The Federal Trade Commission issued its original complaint in this proceeding on January 19, 1954. This was amended and supplemented by a subsequent complaint issued on July 13, 1954. Hearings were commenced on January 12, 1955, and continued periodically until May 14, 1958. During the course of the hearings which took 113 days, the testimony of more than 250 witnesses was taken.[1] Counsel for the Commission filed proposed findings of fact and conclusions of law on November 10, 1958. The various respondents (petitioners herein)[2] filed their separate counter-findings of fact,

---

1. The record of the case is comprised of approximately 14,000 pages of testimony, 130 pages of depositions and 1,300 documentary exhibits totalling about 10,000 pages.

2. Several companies that were respondents before the Commission are not petitioners herein since the Commission's order does not affect them. The respondents that are petitioners herein are (1) Bethlehem Steel Corporation which is the parent of Bethlehem Steel Company and Bethlehem Pacific Coast Steel Corporation. Bethlehem operated five eastern mills and was the largest producer of iron and steel products and the largest scrap consumer in the eastern part of the United States. Bethlehem-Pacific operated three western plants and was the largest scrap purchaser on the Pacific Coast. (2) United States Steel is involved because of its purchases of scrap for its plant located in Geneva, Utah which is the largest scrap consumer on the western slope of the Rocky Mountains. (3) Weirton Steel Company, a subsidiary of National Steel Corporation, is the third largest consumer of scrap purchased from broker-dealer sources in the Pittsburgh-Youngstown area. (4) Colorado Fuel and Iron Corporation (C.F. & I.) an original party and successor by merger to John A. Roebling's Sons Corporation, at the time of the proceeding owned five plants and was the ninth largest steel producer in the United States. Its plant at Pueblo, Colorado was the largest scrap consumer in the

Rocky Mountain area. Its other plants constituted the second largest scrap consuming unit in the North Atlantic area. (5) Phoenix Steel Corporation had two plants in Pennsylvania, and they are the 20th largest integrated steel-producing works in the United States, and in some years were the second largest scrap consuming unit, among the reporting mills, in the North Atlantic area. (6) Granite City Steel Company is the 16th largest integrated steel producer in the United States and is the largest scrap purchaser in the St. Louis area. (7) Lukens Steel Company is the fourth largest scrap purchaser in the North Atlantic area. (8) Detroit Steel Corporation is the 17th largest integrated steel producer and appeared as a respondent below as a result of its purchases for its plant at Portsmouth, Ohio. (9) McLouth Steel Corporation is the 19th largest integrated steel producer in the United States and was made a respondent below as a result of its operations at its facilities at Trenton, Michigan. (10) Baldwin-Lima-Hamilton Corporation (B-L-H) appeared below because of its operations and scrap purchases at its plant at Burnham, Pennsylvania. (11) Edgewater Steel Company is the 27th largest semi-integrated steel producer in the United States. (12) Bucyrus-Erie Company is a petitioner herein by reason of its scrap buying policy for its plants at Erie, Pennsylvania. (13) Grinnell Corporation, successor by merger to Columbia Malleable Castings Corporation, is a petitioner as a result

conclusions of law and orders from January 5, 1959 to January 13, 1959. The hearing examiner's initial decision was filed on March 29, 1961. Oral argument before the Commission was heard on November 21, 1961, and the Commission's opinion, which basically adopted the hearing examiner's initial decision, was announced on November 15, 1962. On April 11, 1963, Luria Brothers and Company, Inc. petitioned this Court, pursuant to Section 5(c) of the Federal Trade Commission Act, 38 Stat. 719 (1914), as amended 15 U.S.C. § 45(c) (1958), and to Section 11 of the Clayton Act, 38 Stat. 734 (1914), as amended 15 U.S.C. § 21(c), to review and set aside the order of the Commission dated February 13, 1963.

## I. THE COMPLAINT

The complaint, as finally amended and supplemented, was in two counts. Count I in substance charged that Luria and the other petitioning mills entered into a series of agreements whereby Luria was to act as the exclusive or substantially exclusive broker for the petitioning mills. It charged that these agreements led to a restraint of trade and tended to create a monopoly in the scrap metal market in violation of Section 5 of the Federal Trade Commission Act, 15 U.S. C. § 45(a) (1).[3] Count I also charged that the petitioning mills conspired to effect a monopoly in Luria, that Luria and others restrained trade in export scrap, that petitioners engaged in coercive tactics, and that Luria acquired various competing companies—all in violation of Section 5.

Count II specifically charged Luria with violation of Section 7 of the Clayton Act, 15 U.S.C. § 18[4] by the acquisition of the stock of Southwest Steel Company, a competing broker, and the stock of six other companies.

Several charges were dismissed by the hearing examiner and the Commission. Those sustained were a finding that petitioners violated Section 5 of the Federal Trade Commission Act by separate agreements whereby each mill made Luria its exclusive or substantially exclusive broker; that Luria's participation in the sale of scrap to the purchasing agent, Office Commun des Consommateurs de Ferraille (OCCF), for the Coal and Iron Community of Western Europe was illegal; and that Luria's ownership of the stock of Southwest violated Section 7 of the Clayton Act.

The Commission's order prohibited Luria from contracting or agreeing to act as the exclusive or substantially exclusive broker for any plant of any respondent mill or any other buyer of scrap iron and steel; forbad the respondent mills without limit as to time to buy all or substantially all their scrap from or through Luria, and forbad them for five years to buy more than 50 percent of their scrap from Luria except to the extent that scrap, adequate in quantity and quality, is not available from other suppliers on terms which are substantially similar and competitive; forbad Luria, directly or indirectly, to agree to act as

---

of its scrap purchases for its iron foundry at Columbia, Pennsylvania. (14) Southwest Steel Corporation was a scrap broker which competed with Luria in the Pittsburgh-Youngstown area. On February 1, 1950, Luria purchased all of the issued and outstanding stock of the company thereby eliminating Southwest as a competing factor.

3. "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." Section 5(a), (1), 38 Stat. 717, as amended by 52 Stat. 111 (1938), and as further amended by 66 Stat. 632 (1952), 15 U.S.C. § 45(a) (1) (1964).

4. "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." Section 7, 38 Stat. 731 (1914), as amended by 64 Stat. 1125 (1950), 15 U.S.C. § 18 (1964).

the exclusive or substantially exclusive broker in the export of scrap; forbad Luria for five years from acquiring the business of any scrap broker or dealer without the permission of the Commission and ordered Luria to divest itself of its interest in Southwest.

It is from these findings and the foregoing order that petitioners seek review by this Court.

## II. INDUSTRIAL FACTS

At least 98 percent of the iron and steel scrap consumed in the United States is purchased by the producers of iron and steel. Scrap and pig iron are the principal metallics used in making iron and steel. Part of the scrap used in the production process is generated as a waste product of the mills' own activities and is referred to as "home scrap." This constitutes about one-half of the scrap consumed by producers. The remainder must be purchased from outside sources and is referred to as "purchased scrap." Sources of purchased scrap include railroads, industrial materials, ships, automobiles, discarded household appliances, etc.

Much scrap is collected by a vast army of junk dealers and peddlers who make regular rounds for this purpose. These junkmen usually sell their scrap to larger dealers who in turn sell directly to the consumer or to brokers. Approximately 90 percent of all scrap used is purchased either from dealers or brokers. Scrap brokers, as that term is used in the industry, has reference to persons who purchase and sell scrap for their own account, taking title to it and assuming all the risks incident to ownership. In effect they are wholesale dealers, but do not take physical possession of the material. Scrap dealers, on the other hand, operate yards where they take possession of the scrap, sort and process it. There is no hard and fast line differentiating brokers from dealers since in many instances, a dealer may act as a broker and some brokers also own yards where they operate as dealers.

Brokers derive their profit from the difference between what they pay for the scrap and what they can get for it. In general, they aim at a differential of $1.00 a gross ton, but because of market fluctuations and varying competitive conditions, the brokerage business is highly speculative.

## III. HISTORY OF LURIA

The Luria business began about 1889 when the grandfather and greatgrandfather of the present generation of Lurias began to collect scrap. A small office was opened in Reading, Pennsylvania, and the business was incorporated in 1918. By 1930, Luria had opened offices in New York, Pittsburgh, Boston and Philadelphia and set up two yards in Pennsylvania. By 1946, Luria had become a substantial supplier to eleven of the petitioning mills. At the same time Luria expanded westward opening offices in Detroit, Chicago, Cleveland, Houston and St. Louis. Later Luria opened offices in Colorado, Alabama, Utah, California and Oregon. Domestically Luria is the largest scrap broker with 16 offices and 6 yards located in representative cities throughout the country. When the Korean War ended in 1953, Luria entered the export market by supplying Hugo Neu, a broker specializing in the export of scrap. In 1954, Luria and two other brokers joined forces and entered into export agreements with OCCF.

## IV. THE RELEVANT DOMESTIC MARKETS

The statistical information gathered by the Commission covers the scrap purchases of practically all the steel mills in the United States since approximately 99 percent of the country's steel mills reported their purchases to the Commission. These mills referred to as "reporting mills" account for between two-thirds and three-fourths of all the scrap consumed in the United States. As previously indicated, 90 percent of the scrap purchased by the reporting mills is obtained from broker-dealer sources. In tabulating its data the Commission properly excluded purchases from sources other than broker-dealers since the sales by industrial fabricators, railroads and shipyards do not effectively compete in

the market in which Luria and other broker-dealers operate.

In evaluating the effect of Luria's operations on the scrap market the Commission divided the country into five geographic areas, one subdivision and the nation as a whole. (1) The North Atlantic area consists of the six New England states, New York, New Jersey, Eastern Pennsylvania, Delaware, Maryland and the District of Columbia. This area contains 24 reporting mills which operate 38 plants. During the pertinent period of the investigation, the years 1947–1954, the petitioning mills accounted for 80 percent of all scrap purchased by the reporting mills from broker-dealer sources. The purchases by the reporting mills in this district accounted for approximately 20 percent of all purchases by domestic mills from broker-dealer sources. (2) The Eastern Pennsylvania district is a subdivision of the North Atlantic area in which are located 13 of the above 24 mills. The petitioning mills accounted for 84 percent of the purchases made by these 13 reporting mills. Together these 13 mills account for approximately one-half of all purchases made by all the reporting mills in the North Atlantic area. (3) The Pittsburgh-Youngstown area is a hexagonal territory extending from Johnstown on the east, through Monessen and Washington, Pennsylvania, northwest through Steubenville, Ohio, Weirton, West Virginia, Youngstown and Warren, Ohio, east through Sharon, Pennsylvania, and back to Johnstown via Butler, Pennsyl- vania. Twenty-three mills operating 29 plants are located within this area. In 1954, the petitioning mills accounted for 18 percent of the total purchases in that area by all reporting mills. (4) The St. Louis area includes metropolitan St. Louis and its suburban areas in Missouri and Illinois. Granite City, the only petitioner in this area, and Laclede Steel Company, a reporting mill, operate the only two mills in the area. The purchases of the two mills and three large foundries in the area represent 80 percent of all purchases in the region. Granite City alone accounts for one-half of the scrap purchased by these five companies. (5) The Rocky Mountain area includes the states of Arizona, Utah, Colorado, Wyoming, Idaho and Montana. Petitioners, C.F.&I. at Pueblo, Colorado, and U. S. Steel at Geneva, Utah, operate the only two mills in the area. (6) The Pacific Coast area contains 9 reporting mills with a total of 12 plants in this area which is comprised of the states of California, Oregon and Washington. The purchases of Bethlehem-Pacific, the sole petitioning mill in the area, total almost one-half of all the purchases of the 9 reporting mills. (7) In the United States as a whole, the petitioning mills accounted for 30 percent in 1953, and 24 percent in 1954 of total scrap purchases by all reporting mills from broker-dealer sources.

The following table clearly depicts the extent to which the practices of the petitioning mills affect the scrap markets in the various areas.

*Percentage Shares of the Petitioning Mills' Purchases from Broker-Dealer Sources in Total Purchases from Such Sources By All Reporting Mills in the Respective Areas*

| | 1947 | 1948 | 1949 | 1950 | 1951 | 1952 | 1953 | 1954 |
|---|---|---|---|---|---|---|---|---|
| North Atlantic | 80 | 79 | 75 | 74 | 77 | 78 | 79 | 80 |
| Eastern Pennsylvania | 82 | 81 | 81 | 79 | 80 | 79 | 79 | 84 |
| Pittsburgh-Youngstown | — | — | — | 13 | 15 | 16 | 16 | 18 |
| St. Louis | — | — | — | 45 | 44 | 39 | 50 | 44 |
| Rocky Mountain | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Pacific Coast | 40 | 37 | 38 | 41 | 43 | 45 | 52 | 49 |
| United States | 27 | 25 | 27 | 24 | 28 | 38 | 30 | 24 |

Luria's percentage share in the total scrap purchases by all reporting mills from broker-dealer sources in each relevant area between 1947 and 1954 is indicated by the following tabulation.

| | 1947 | 1948 | 1949 | 1950 | 1951 | 1952 | 1953 | 1954 |
|---|---|---|---|---|---|---|---|---|
| North Atlantic | 34.1 | 38.1 | 46.8 | 54.6 | 62.0 | 68.8 | 73.1 | 74.5 |
| Eastern Pennsylvania | 48.5 | 51.8 | 58.3 | 72.4 | 72.2 | 74.1 | 78.9 | 83.3 |
| Pittsburgh-Youngstown | 20.4 | 20.6 | 26.2 | 37.2 | 32.2 | 35.4 | 36.5 | 36.0 |
| St. Louis | —— | —— | 16.5 | 31.0 | 51.7 | 42.5 | 51.6 | 45.4 |
| Rocky Mountain | 99.3 | 94.0 | 98.6 | 95.2 | 87.2 | 90.6 | 95.5 | 98.9 |
| Pacific Coast | —— | —— | 6.6 | 11.7 | 21.2 | 33.3 | 45.8 | 50.6 |
| United States | 17.1 | 18.8 | 22.3 | 29.4 | 31.4 | 33.3 | 36.5 | 33.7 |

Even when the Commission confined its evaluation of Luria's domination in the scrap industry to a comparison of the purchases made by the petitioning mills from Luria with those made by all reporting mills from all brokers and dealers, Luria's overshadowing position was brought into focus as indicated by the following table.

*Percentage Shares of the Petitioning Mills' Purchases from Luria and Subsidiaries in Total Purchases from Broker-Dealers By All Reporting Mills*

| | 1947 | 1948 | 1949 | 1950 | 1951 | 1952 | 1953 | 1954 |
|---|---|---|---|---|---|---|---|---|
| North Atlantic | 29 | 33 | 40 | 47 | 56 | 62 | 68 | 70 |
| Eastern Pennsylvania | 41 | 43 | 50 | 61 | 61 | 63 | 73 | 75 |
| Pittsburgh-Youngstown | 10 | 7 | 15 | 9 | 11 | 12 | 12 | 12 |
| St. Louis | — | — | 0.1 | 29 | 44 | 39 | 50 | 44 |
| Rocky Mountain | 100 | 94 | 99 | 96 | 87 | 91 | 96 | 99 |
| Pacific Coast | — | — | 2 | 8 | 16 | 25 | 39 | 39 |
| United States | 10 | 10 | 14 | 16 | 21 | 22 | 25 | 21 |

Luria's position of dominance in its relations with the petitioning mills in 1953 and 1954 is indicated by the percentage of scrap requirements filled by Luria for each mill.

*Percent of Total Bought from Luria*

| | 1953 | 1954 |
|---|---|---|
| Lukens | 89.8 | 87.7 |
| B.L.H. | 96.7 | 94.1 |
| Columbia | 100.0 | 100.0 |
| C.F.&I. | 98.4 | 95.3 |
| Edgewater | 100.0 | 100.0 |
| Phoenix | 100.0 | 99.4 |
| Granite City | 100.0 | 100.0 |
| Detroit | 91.1 | 100.0 |
| National | 70.2 | 69.8 |
| U.S.S. | 89.5 | 93.9 |
| McLouth | 71.9 | 74.2 |
| Bethlehem | 81.2 | 80.9 |
| Bethlehem-Pacific | 75.4 | 80.4 |
| Bucyrus-Erie | 89.1 | 84.2 |

## V. THE FOREIGN MARKET

In 1954, Luria directed its efforts toward securing a hold in the export market. In 1953, the European Common Market countries had formed a central buying office to purchase scrap required by foreign steel mills. This office, OCCF, contacted Luria, Schiavone-Bonomo, and Western Steel International Corporation for the purpose of obtaining a scrap broker in the United States. The three concerns negotiated a contract with OCCF on July 14, 1954 providing that

the three would provide all scrap to be purchased by OCCF until December 31, 1954. By subsequent arrangement, the contract was extended until December 31, 1955. Between 1954 and 1956, the six Common Market countries purchased between 66 and 84 percent of the total scrap exported from the United States to Europe. In 1954, the Luria group supplied 90 percent and in 1955, 95 percent of total scrap purchased by OCCF from the United States.

The agreement with OCCF had a substantial effect on Luria's domestic competitors since in 1954, Luria foreclosed 80 percent of the domestic scrap market in the North Atlantic area. With only 20 percent of the domestic market available, Luria's competitors were forced to dispose of their scrap abroad. Since the six Common Market countries purchased between 66 and 84 percent of the total scrap exported to Europe in the period between 1954 and 1956, Luria's competitors were effectively barred from both the domestic and foreign scrap markets.

## VI. THE SOUTHWEST ACQUISITION

Southwest was a scrap broker with its scrap sales concentrated in the Pittsburgh-Youngstown area. Prior to its acquisition by Luria's purchase of all its issued and outstanding stock on February 1, 1951, Southwest was the second largest scrap broker in the area preceded only by Luria. Of the nine other principal brokers in the area, Southwest's sales exceeded its closest competitor by two to one. Before the acquisition, Luria and Southwest combined supplied almost one-half of the total scrap purchased by the reporting mills from brokers and dealers in the area. Moreover, both companies supplied the same consumers. The record justifies the Commission's finding that Luria and Southwest were substantial competitors in the Pittsburgh-Youngstown area.

## VII. LURIA'S EXCLUSIVE OR SUBSTAN-TIALLY EXCLUSIVE OPERATIONS WITH THE VARIOUS PETITIONERS

The Commission's finding that Luria's practices violated Section 5 of the Feder-al Trade Commission Act is based on evidence that during the years 1947 through 1954, the percentage of business conducted with Luria greatly increased and Luria employed tactics in conjunction with the various petitioners designed to eliminate competing brokers. A review of the record manifestly supports the Commission's conclusions.

Bethlehem is the largest scrap purchaser in the Eastern part of the United States where it operates four scrap consuming plants. Prior to 1950, Bethlehem's scrap purchases from Luria for its four plants in the North Atlantic area were relatively small. After 1950, this situation strikingly changed. Between 1947 and 1949, Luria's share rose from 15 to 32 percent while between 1950 and 1954, it increased from 40 to 83 percent. Since Bethlehem's purchases from broker-dealer sources represented close to 50 percent of the total broker-dealer purchases in the North Atlantic area, in 1954 Luria's competitors were foreclosed from 40 percent of the market.

Concomitant with Luria's percentage increase, Bethlehem began to discriminate against Luria's competitors, many of whom had been former suppliers of Bethlehem. One of these competitors was Schiavone-Bonomo Corporation, which in 1947 was Bethlehem's second largest supplier. During the succeeding years Schiavone-Bonomo's sales significantly decreased until in 1954, it was no longer among Bethlehem's five largest suppliers. Bethlehem also placed restrictions on Schiavone-Bonomo by requiring it to secure scrap only from certain designated areas and by paying it less than it gave to Luria. These same practices were employed against other former suppliers to Bethlehem such as Commercial Steel and Chemical Corporation, Harcon Corporation and Louis Cohen & Sons. These and other broker-dealer concerns found that their sales to Bethlehem decreased as Luria's increased, and they were informed by Bethlehem that it would only purchase the scrap these companies were selling if they sold through Luria. Not only did Bethlehem

cease making purchases from former broker-dealers, but it channelled shipments from direct suppliers such as industrial fabricators and railroads through Luria. The record clearly supports the hearing examiner's conclusion that "As a result of these changes, somewhere between 1950 and 1953 Luria became Bethlehem's substantially exclusive broker."

The relationship between Luria and Bethlehem is symptomatic of the condition that existed throughout the North Atlantic area. The same policy of increasing sales and decreasing competition existed in Luria's relations with C.F.&I.'s four plants in the area, with Phoenix, Lukens, B-L-H and Grinnell. It is clear that Luria had established itself as the exclusive or substantially exclusive broker for the six petitioning mills in the area whose combined purchases of scrap accounted for approximately 80 percent of the total scrap purchased by all the reporting mills.

The Rocky Mountain area contains two reporting mills, one owned by C.F.&I. located at Pueblo, Colorado, and the other owned by U. S. Steel located at Geneva, Utah. C.F.&I.'s mill is the largest scrap consuming plant in the area. C.F.&I. admits that it entered into an understanding with Luria on June 1, 1946 to the effect that the latter would serve as its exclusive broker. On the same day a formal notice to that effect was issued to the trade. The understanding was formalized by a written contract executed on August 23, 1946, to run for a term of five years. Although the formal agreement was terminated on October 9, 1946, the oral agreement continued in full force. This is indicated by the fact that except for 1951 when due to Government allocations Luria supplied 95 percent, in the years 1947 through 1954, Luria supplied 100 percent of the scrap purchased by C.F.&I. for its Pueblo plant.

In October, 1948, the Geneva plant of U. S. Steel accepted Luria's offer to act as its exclusive broker. Notice of this was sent to the trade, and although U. S.

Steel contends that the agreement terminated in 1952, this contention is not supported by the statistical evidence nor by any announcement of the alleged termination by U. S. Steel. Following the agreement, Luria supplied 95 percent of the scrap purchased from broker-dealer sources by Geneva in 1949, 90 percent in 1953 and 94 percent in 1954. Certainly if the agreement was terminated as U. S. Steel argues, its termination did not alter petitioner's relations with Luria.

Bethlehem-Pacific, the only petitioner in the Pacific Coast area, operates three plants which account for approximately 50 percent of the scrap purchased by the reporting mills. Bethlehem-Pacific's practices in the area closely followed those of Bethlehem's in the North Atlantic area. For example, until 1950, its Los Angeles plant purchased scrap from numerous brokers. In October of that year, Bethlehem-Pacific entered a ten year written contract whereby it agreed to purchase the major portion of its monthly supplies from Luria. The effect of the agreement is evidenced by the fact that in 1949 Luria supplied the Los Angeles plant with only one percent of its scrap requirements where as in 1951, it increased to 57 percent and in 1953, it reached 94 percent. Furthermore, in some instances the brokers who had previously supplied the Los Angeles plant were told they would have to sell through Luria.

Luria first supplied the Seattle plant in 1949. By 1952, its sales accounted for 46 percent and by 1954, for 83 percent of the scrap purchased by the plant from broker-dealer sources. Here too, former suppliers were told they would have to sell their scrap through Luria.

Luria's supply agreements reached such proportions that in 1954, it supplied 80 percent of Bethlehem-Pacific's scrap requirements resulting in the foreclosure of 40 percent of the Pacific Coast market from competition.

Luria's exclusive supply agreement for the St. Louis area is indicated by its relationship with Granite City. Prior to 1950, Luria supplied Granite City with

only one percent of its scrap, the remaining 99 percent being filled by other brokers and dealers in the area. In March, 1950, Granite City and Luria agreed that the latter would supply the mill. A notice was sent to the trade announcing the "appointment of Luria Brothers & Company, Inc. of Philadelphia, Pennsylvania, as our exclusive scrap broker." Former suppliers were told to sell through Luria. In 1953, this arrangement accounted for 50 percent of total scrap purchases by the reporting mills in the area.

The same program was carried out in the Pittsburgh-Youngstown area. Luria exhibited the same substantial growth while competitors experienced decreases and were told they must sell through Luria. In this manner Luria has become the exclusive or substantially exclusive broker for Bethlehem's Johnstown plant, Edgewater, and Weirton, a subsidiary of National Steel. These three plants account for 18 percent of total purchases by all reporting mills in the area and by 1954, Luria accounted for 36 percent of scrap sales by all brokers and dealers in the area.

The Commission's examination of the scrap purchasing policies of Bucyrus, McLouth, and Detroit Steel, which did not fit into any of the other previously delineated areas, also revealed Luria's exclusive or substantially exclusive scrap supplying arrangements.

On the basis of the foregoing the Commission decided that Luria's agreements were in violation of Section 5 of the Federal Trade Commission Act. The petitioning mills challenge these findings claiming (1) the statistical data should not be limited to broker-dealer sources but should include all suppliers of scrap metal; (2) the market areas used by the hearing examiner did not comply with the standards announced by the applicable case law; (3) the agreements were terminable at will and, therefore, do not violate the anti-trust laws; (4) the decision to buy mainly from Luria was a proper business decision independently reached by the petitioning mills; (5) the mills were forced to purchase from Luria because other brokers could not meet their increasing demands; and (6) the order of the Commission is arbitrary, unreasonable and ambiguous. They also claim error in the Commission's finding of a violation of Section 7 of the Clayton Act. We turn now to a consideration of these points.

THE FEDERAL TRADE COMMISSION ACT

■ Petitioners urge error in the Commission's compilation of data. They argue it should not have been restricted to purchases only from broker-dealer sources but should have included the sales of all scrap suppliers to all scrap purchasers. Several reasons justify the exclusion. First, if the Commission had attempted to obtain this information, its task would have reached enormous if not prohibiting proportions. Second, the information obtained contains the scrap purchases of practically every steel mill in the United States. These purchases account for between two-thirds and three-fourths of all the scrap used in the country and of this amount, 90 percent is purchased from broker-dealer sources. Third, the purpose of the proceeding was to open the market to Luria's competitors who consist of other broker-dealers whose economic livelihood is directly affected by the size of the market freed from monopolistic control. The Commission was not required to include suppliers other than broker-dealers especially since their inclusion would not have substantially altered the result. Cf. United States v. Philadelphia Nat. Bank, 374 U.S. 321, 364, n. 40, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1962).

■ Petitioners also contend the Commission erred in its determination of the relevant market areas within which to measure the effects of Luria's influence. The geographical divisions selected by the Commission were based on the natural gravitational effects of economic factors. The evidence indicates and the Commission was warranted in finding that transportation costs produced various clusters of scrap buyers and sellers. Cf. United States v. Philadelphia Nat.

Bank, supra, 374 U.S. at page 358, 83 S.Ct. 1715; American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F. Supp. 387, 398 (D.C.S.D.N.Y.1957), aff'd 259 F.2d 524 (2 Cir. 1958). As a rule sales were contained within an area having a radius of approximately 100 miles from the broker-dealer. Shipment beyond this distance became prohibitively expensive. Of course, at times sales were made to plants located more than 100 miles from the broker-dealer, but these long distance sales were an exception and occurred only when needs were such that the closer sellers were unable to meet demands.

 Petitioners urge that the theory of the Government's case was based on Section 3 of the Clayton Act, 15 U.S. C. § 14,[5] because of the emphasis placed on proof of agreements or arrangements between the various mills. They argue, therefore, that their actions and practices must be judged in reference to the standards governing cases arising under the Clayton Act. The error in petitioners' argument is that it is clear that the proceeding was brought under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, to enjoin an incipient monopoly which if undeterred would violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.[6] Section 5 of the Federal Trade Commission Act proscribes a broad area. The unfair methods of competition violative of that section are not limited to practices violative of the Sherman Act, the Clayton Act or the common law. The Federal Trade

Commission Act was designed as a supplement to and has been interpreted as a complement to the Sherman and Clayton Acts. Federal Trade Commission v. Motion Picture Advertising Service Co., 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953), rehearing denied, 345 U.S. 914, 73 S.Ct. 638, 97 L.Ed. 1348 (1953); Federal Trade Commission v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L. Ed. 1010 (1948), rehearing denied, 334 U.S. 839, 68 S.Ct. 1492, 92 L.Ed. 1764 (1948); Federal Trade Commission v. R. F. Keppel & Bro., 291 U.S. 304, 54 S. Ct. 423, 78 L.Ed. 814 (1934); Federal Trade Commission v. Raladam Co., 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324 (1931). Speaking of the Commission and its function under the Federal Trade Commission Act, the Supreme Court stated:

"Far from being regarded as a rival of the Justice Department and the district courts in dissolving combinations in restraint of trade, the new Commission was envisioned as an aid to them and was specifically authorized to assist them in the drafting of appropriate decrees in antitrust litigation. All of the committee reports and the statements of those in charge of the Trade Commission Act reveal an abiding purpose to vest both the Commission and the courts with adequate powers to hit at every trade practice, then existing or thereafter contrived, which restrained competition or might lead to such restraint if not stopped in its incipient stages." Federal Trade

---

5. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to * * * make a sale or contract for sale of goods * * * on the condition, agreement or understanding that the * * * purchaser thereof shall not use or deal in the goods * * * of a competitor or competitors of the * * * seller, where the effect of such * * * sale, or contract for sale * * * may be to substantially lessen competition or tend to create a monopoly in any line of commerce." Section 3, 38 Stat. 731 (1914), 15 U.S.C. § 14 (1964).

6. "Every contract, combination in the form of trust or otherwise, or conspiracy. in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. * * *" Section 1, 26 Stat. 209 (1890), as amended by 50 Stat. 693 (1955), 15 U.S.C. § 1 (1964).

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *" Section 2, 26 Stat. 209 (1890), 15 U.S.C. § 2 (1964).

Commission v. Cement Institute, supra, 333 U.S. at page 692, 68 S.Ct. at page 799.

The same argument raised by petitioners here was considered and rejected by the Supreme Court in its recent decision in Federal Trade Commission v. Brown Shoe Co., 384 U.S. 316, 320, 86 S.Ct. 1501, 1504, 16 L.Ed.2d 587 (1965). The Court stated:

" * * * the Commission has broad powers to declare trade practices unfair. This broad power of the Commission is particularly well established with regard to trade practices which conflict with the basic policies of the Sherman and Clayton Acts even though such practices may not actually violate these laws. The record in this case shows beyond doubt that Brown, the country's second largest manufacturer of shoes, has a program, which requires shoe retailers, unless faithless to their contractual obligations with Brown, substantially to limit their trade with Brown's competitors. This program obviously conflicts with the central policy of both § 1 of the Sherman Act and § 3 of the Clayton Act against contracts which take away freedom of purchasers to buy in an open market. Brown nevertheless contends that the Commission has no power to declare the franchise program unfair without proof that its effect 'may be to substantially lessen competition or tend to create a monopoly' which of course would have to be proved if the Government were proceeding against Brown under § 3 of the Clayton Act rather than § 5 of the Federal Trade Commission Act. We reject the argument that proof of this § 3 element must be made for as we pointed out above our cases hold that the Commission has power under § 5 to arrest trade restraints in their incipiency without proof that they amount to an outright violation of § 3 of the Clayton Act or other provisions of the antitrust laws."

If we were to accept petitioners' argument and require proof necessary to show Sherman or Clayton Act violations, we would vitiate the congressional purpose behind the enactment of the Federal Trade Commission Act since the Commission would be powerless to deal with unfair trade practices in their incipient stages. See Atlantic Rfg. Co. v. Federal Trade Commission, 381 U.S. 357, 369, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1964). Thus in performing its function the Commission need only use the antitrust statutes as guidelines, and in reviewing its determinations, this Court decides whether the Commission's findings of fact have support in the record and a reasonable basis in law. 15 U.S.C. § 45(c); Atlantic Rfg. Co. v. Federal Trade Commission, supra, 381 U.S. at page 367, 85 S.Ct. 1498.

Since the Commission's purpose in the instant proceeding was to arrest in its incipiency acts and practices which would develop into Sherman Act violations, we look to cases decided under that Act for guidance. Section 1 of the Sherman Act makes illegal any unreasonable restraint on interstate commerce regardless of the amount of commerce involved while Section 2 outlaws the monopolization of "any part" of interstate commerce. "Any part" has been construed to mean any appreciable part. Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 611, 73 S.Ct. 872, 97 L.Ed. 1277 (1952); United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010 (1946). Guided by these and other decisions we are satisfied beyond question that the requisite amount of commerce was involved here.

The record supports the Commission's conclusions that Luria's practices during the years under investigation showed its intention to monopolize the scrap brokerage business. The various written agreements entered into between Luria and C.F.&I. and U. S. Steel indicate Luria's intention. Although, it is true that these agreements were formally terminated within a short time, the Commission was justified in finding that in fact the relationship remained unchanged. Petitioners place much emphasis on

their contention that since any arrangements that might exist were terminable by either party at will, no unlawful activity was shown. The evidence shows, however, that even if this were in fact true, nevertheless there had been no termination in the past and the prospects for any in the future were negligible. Also pointing to the exclusive or substantially exclusive supply arrangements was the evidence that Luria's competitors were being turned away from their former customers and directed to sell through Luria. Indeed on the basis of this and other evidence the Commission was warranted in concluding that Luria's practices in conjunction with its purchasers were in the nature of those proscribed by the Sherman Act and which the Commission was authorized to enjoin under the Federal Trade Commission Act. The methods employed by Luria to foreclose the market from its competitors clearly constituted unfair methods of competition within the ban of Section 5 of the Federal Trade Commission Act. Federal Trade Commission v. Motion Picture Advertising Service Co., supra, 344 U.S. at page 395, 73 S.Ct. 361.

Petitioners seek to justify their actions on the grounds that their dealings with Luria were based on sound business judgment. They claim they dealt with Luria only because it was the best in the business. If this argument were accepted under the circumstances of this case, it would open a large loophole in our antitrust laws. Furthermore, the evidence indicates that the decision to direct business toward Luria and away from other broker-dealers was activated by more than pure business motives. The Commission acted entirely within its discretion in choosing not to accept this attempted justification. Federal Trade Commission v. Motion Picture Advertising Service Co., supra, 344 U.S. at page 395, 73 S.Ct. 361.

We have reviewed the evidence relating to the foreign market and Luria's agreement with OCCF. There is substantial support for the Commission's conclusion that Luria's practices here were also in violation of Section 5 of the Federal Trade Commission Act and must be enjoined in order to open the market to competition.

THE ORDER

Several of petitioners' objections are directed at the Commission's order. Paragraph 1 of the order which prohibits Luria from acting as the exclusive or substantially exclusive broker for any of the plants of the petitioning mills is challenged on the grounds of vagueness and ambiguity. Paragraph 2(b) prohibits the petitioning mills, for a period of five years, from purchasing more than 50 percent of their annual scrap needs from Luria unless "scrap adequate in quantity and quality is not available from other suppliers on terms which are substantially similar and competitive." Petitioners attack the 50 percent limitation as arbitrary. They also claim surprise contending that they had no prior notice of the specific limitation and further challenge the order on the grounds that it is an improper affirmative command.

In reviewing the propriety of the various provisions of the order, we are mindful of the language of the Supreme Court in Federal Trade Commission v. National Lead Co., 352 U.S. 419, 428, 77 S.Ct. 502, 509, 1 L.Ed.2d 438 (1956):

"The Court has held that the Commission is clothed with wide discretion in determining the type of order that is necessary to bring an end to the unfair practices found to exist. In Jacob Siegel Co. v. Federal Trade Commission, 327 U.S. 608 [66 S.Ct. 758, 90 L.Ed. 888] (1946), the Court named the Commission 'the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.' Id., [327 U.S.] at 612–613 [66 S.Ct. at 760]. Thereafter, in Federal Trade Commission v. Cement Institute, 333 U.S. 683, 726

[68 S.Ct. 793, 815, 92 L.Ed. 1010] (1948), the Court pointed out that the Congress, in passing the Act, 'felt that courts needed the assistance of men trained to combat monopolistic practices in the framing of judicial decrees in antitrust litigation.' In the light of this, the Court reasoned, it should not 'lightly modify' the orders of the Commission. Again, in Federal Trade Commission v. Ruberoid Co., supra, [343 U.S. 470] at 473 [72 S.Ct. 800, at 803, 96 L.Ed. 1081], we said that 'if the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity.' We pointed out there that Congress had placed the primary responsibility for fashioning orders upon the Commission. These cases narrow the issue to the question: Does the remedy selected have a 'reasonable relation to the unlawful practices found to exist'?"

■ Petitioners' contention that the language "exclusive or substantially exclusive" is too vague cannot be accepted. The order, when interpreted in light of the record, is clear and not subject to attack on that ground. It is necessarily general. Anything more specific would be subject to evasion. E. B. Muller & Co. v. Federal Trade Commission, 142 F.2d 511, 520 (6 Cir. 1944). Furthermore, the Commission's order is not required to "chart a course for the petitioner." Zenith Radio Corp. v. Federal Trade Commission, 143 F.2d 29, 31 (7 Cir. 1944).

■ Petitioners raise several hypothetical situations in their attack on the Commission's order. However, this avenue has been closed by the Supreme Court.

"Respondents pose hypothetical situations which they say may rise up to plague them. However, 'we think it would not be good judicial administration,' as our late Brother Jackson said in International Salt Co. v. United States, 332 U.S. 392, 401 [68 S.Ct. 12, 17, 92 L.Ed. 20] (1947), to strike the contested paragraph of the order to meet such conjectures. The Commission has reserved jurisdiction to meet just such contingencies. As actual situations arise they can be presented to the Commission in evidentiary form rather than as fantasies. And we might add, if there is a burden that cannot be made lighter after application to the Commission, then respondents must remember that those caught violating the Act must expect some fencing in. United States v. Crescent Amusement Co., supra, [323 U.S. 173] at 187 [65 S.Ct. 254, at 261, 89 L.Ed. 160]." Federal Trade Commission v. National Lead Co., supra, 352 U.S. at page 431, 77 S.Ct. at page 510.

In the instant litigation the Commission has assured the petitioners of its willingness to grant relief if the circumstances should arise. Even without that assurance petitioners could obtain all the necessary relief under the Commission's Rules of Practice, 16 C.F.R. § 3.26(b) (Supp. 1966).

■ Petitioners' claim of surprise is based on their assertion that the first indication of the 50 percent provision in paragraph 2(b) came when they read the examiner's order. But petitioners were given ample opportunity to object to this provision when they appealed to the Commission. The Commission heard these objections and gave petitioners a second opportunity to protest by entering a proposed order with its opinion. The final order was issued only after the Commission had heard further exceptions to the proposed order. The fact that petitioners did not have an opportunity to be heard orally by the examiner regarding the 50 percent provision is not a defect requiring reversal since all the requirements of a proper administrative hearing were met prior to the issuance of the final order.

" * * * When there is an appeal to the Board, the findings, conclusions, and orders of the examiner are only

tentative or interlocutory in nature. And in such cases it is the orders of the Board which are final and appealable. Thus as long as the requirements of a full hearing are satisfied at some time prior to the issuance of a final order, there can be no complaint on that ground." Sisto v. C.A.B., 86 U.S. App.D.C. 31, 179 F.2d 47, 51 (1949). If petitioners felt it was necessary to introduce evidence before the examiner relating to the 50 percent provision, they could have asked the Commission to reopen the case. Federal Trade Commission v. National Lead Co., supra, 352 U.S. at page 428, 77 S.Ct. 502. Furthermore, the order itself provides that the 50 percent limitation only applies "except to the extent that iron and steel scrap, adequate in quantity and quality, is not available from other suppliers on terms which are substantially similar and competitive with the terms offered by respondent Luria Brothers & Company, Inc."

■ We do not view the order as an affirmative command which seeks to regulate the conduct of business. It calls for the petitioning mills to cease and desist from purchasing more than 50 percent of their annual scrap requirements for their respective plants from Luria. This is a prohibition not an affirmative command, but even if considered an affirmative directive, it would not, on that ground, be invalid. L. Heller & Son v. Federal Trade Commission, 191 F.2d 954 (7 Cir. 1951); Bantam Books, Inc. v. Federal Trade Commission, 275 F.2d 680 (2 Cir. 1960), cert. denied 364 U.S. 819, 81 S.Ct. 51, 5 L.Ed.2d 49 (1960); Haskelite Mfg. Corp. v. Federal Trade Commission, 127 F.2d 765 (7 Cir. 1942).

■ Some of the smaller mills such as Bucyrus and Edgewater object to their inclusion in the Commission's order, claiming that their purchases are too insignificant to be unlawful. We cannot separately view individual purchases by those mills whose annual requirements are not quantitatively significant. All contribute to the unlawful result and all should share in the consequences. In Modernistic Candies v. Federal Trade Commission, 145 F.2d 454 (7 Cir. 1944), the Commission prohibited the distribution of ball-gum boards which were used as gambling devices. The manufacturer of the boards was held liable even though the manufacture of the boards was not per se illegal. The court stated: "We have also held that those who aid and abet such a method of merchandising, those participes criminis with gamblers and their schemes, are likewise engaged in unfair trade practices contrary to public policy." Modernistic Candies v. Federal Trade Commission, supra, 145 F.2d at page 455. The sound principle there upheld sharply applies to the situation before us.

### THE SOUTHWEST ACQUISITION

■ Petitioners, Luria and Southwest, urge error in the Commission's finding of a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, which provides in pertinent part:

"No corporation engaged in commerce shall acquire * * * the stock * * * or * * * assets of another corporation * * * where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The United States Supreme Court in numerous opinions has discussed the meaning of Section 7. United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1963); United States v. Aluminum Co. of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed. 2d 314 (1963); United States v. Philadelphia Nat. Bank, supra, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915; Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1961); United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1956). These decisions and others indicate that Section 7 is directed at both the present and prospective effects of corporate acquisitions. In United States v. E. I. Du Pont De Nemours & Co., supra, 353 U.S. at page

592, 77 S.Ct. at page 877, the Court stated:

"We hold that any acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of the section whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce or in the creation of a monopoly of any line of commerce."

The opinion continues, quoting with approval from this Court's opinion in Transamerica Corp. v. Board of Governors, 206 F.2d 163, 169 (3 Cir. 1953) as follows:

"A monopoly involves the power to * * * exclude competition when the monopolist desires to do so. Obviously, under Section 7 it was not necessary * * * to find that * * * (the defendant) has actually achieved monopoly power but merely that the stock acquisitions under attack have brought it measurably closer to that end. For it is the purpose of the Clayton Act to nip monopoly in the bud. Since by definition monopoly involves the power to eliminate competition a lessening of competition is clearly relevant in the determination of the existence of a tendency to monopolize. Accordingly in order to determine the existence of a tendency to monopoly in * * * any * * * line of business the area or areas of existing effective competition in which monopoly power might be exercised must first be determined." United States v. E. I. Du Pont De Nemours & Co., supra, 353 U.S. at page 592, 77 S.Ct. at page 877.

See also: Brown Shoe Co. v. United States, supra, 370 U.S. at page 317, 82 S.Ct. 1502.

■ Finding a violation of Section 7 the Commission agreed with the hearing examiner's determination of the relevant market. The "area of effective competition" within which competition must be substantially lessened in order to sustain a violation of the Clayton Act "must be determined by reference to a product market (the 'line of commerce') and a geographic market (the 'section of the country')." Brown Shoe Co. v. United States, supra, 370 U.S. at page 324, 82 S.Ct. at page 1523; Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); United States v. Philadelphia Nat. Bank, supra, 374 U.S. at page 356, 83 S.Ct. 1715; United States v. E. I. Du Pont De Nemours & Co., supra, 353 U.S. at page 593, 77 S.Ct. 872.

The record reveals that prior to the acquisition, Luria and Southwest were the two largest suppliers in the Pittsburgh-Youngstown area. They both sold in the same area and to the same customers. The evidence further shows that the Pittsburgh-Youngstown area was the proper section of the country to examine in order to weigh the effect the acquisition would have on commerce. Tampa Electric Co. v. Nashville Coal Co., supra. This is apparent because the mills in that section of the country were supplied by the brokerage houses in the area due to the prohibitive costs of transportation. See United States v. Philadelphia Nat. Bank, supra, 374 U.S. at page 358, 83 S.Ct. 1715. The Commission was also correct in its evaluation of the proper line of commerce, i. e., broker-dealer scrap. (See discussion supra.).

■ Definitely the acquisition had a substantial effect on competition. Whereas prior to the acquisition Luria supplied 26 percent and Southwest 6 percent of the total broker-dealer scrap purchased by the reporting mills in the district, after the acquisition the share of the combine rose to 37 percent. Significant in this regard is the statement by the Supreme Court in United States v. Philadelphia Nat. Bank, supra, 374 U.S. at page 363, 83 S.Ct. at page 1741:

"This intense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects. Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and

results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects. See United States v. Koppers Co., 202 F.Supp. 437 (D.C.W.D.Pa. 1962)."

The decision went on to show that although the Court expressed no opinion on the smallest market share that would threaten undue concentration, it was felt that the 30 percent present in the case before the Court was sufficient. In United States v. Aluminum Co. of America, supra, the Supreme Court found that Section 7 was violated when Alcoa, the leading producer with 27.8 percent of the market acquired another company which accounted for only 1.3 percent. Since after the acquisition by Luria, its sales combined with those of Southwest encompassed 37 percent of the relevant market, this aspect of the case falls squarely within the percentages prohibited in prior decisions.

■■■ Luria also challenges the authority of the Commission to issue that part of its order which requires petitioner to divest itself of "All assets, properties, rights and privileges, tangible and intangible, acquired from Southwest Steel Corporation since December 29, 1950; * * *" Luria's reliance on cases such as FTC v. Western Meat Co. (Thatcher Manufacturing Co. v. FTC and Swift & Co. v. FTC), 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405 (1926) and Arrow-Hart & Hegeman Electric Co. v. Federal Trade Commission, 291 U.S. 587, 54 S.Ct. 532, 78 L.Ed. 1007 (1934) is misplaced since those authorities dealt with the Clayton Act prior to its amendment in 1950. Section 11 of the Clayton Act, 15 U.S.C. § 21(b) grants the Commission the power to order the divestiture of assets as well as stock. It provides in part:

"* * * If upon such hearing the Commission or Board, as the case may be, shall be of the opinion that any of the provisions of said sections have been or are being violated, it shall make a report in writing, in which it shall state its finding as to the facts, and shall issue and cause to be served on such person an order requiring such person to cease and desist from such violations, and divest itself of the stock, or other share capital, or assets, held * * * contrary to the provisions of section * * * 7 * * * of this Act, * * * in the manner and within the time fixed by said order."

See United States v. Philadelphia Nat. Bank, supra, 374 U.S. at pages 339–340, n. 17, 83 S.Ct. 1715.

Reynolds Metals Co. v. Federal Trade Commission, 114 U.S.App.D.C. 2, 309 F.2d 223 (1962) is readily distinguishable from the one at bar. In Reynolds the court modified the Commission's divestiture order by excluding a plant constructed by Reynolds, the acquiring corporation, after the illegal acquisition. The plant in Reynolds was not an asset of the acquired company but was a structure built by Reynolds with its own funds. Here the Commission's order is directed at assets which were obtained by Luria from Southwest as a result of the illegal acquisition.

■■■ Luria also argues that the Commission's five year ban on future acquisitions is too punitive especially since the Commission only found one illegal acquisition during the whole period Luria was in existence. Beyond all doubt the Commission has the power to enjoin future acquisitions. United States v. Crescent Amusement Co., 323 U.S. 173, 186, 65 S.Ct. 254, 89 L.Ed. 160 (1944); United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 575 (D.C.E.D. Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961). The record makes it plain that the Commission's order is based on many factors other than past acquisitions. Furthermore, the order is not a blanket ban since it suggests the Commission will allow future acquisitions within the five year period if Luria can show that "* * *

the planned acquisition will not unduly restrain competition."

■ Petitioners would have us remand this cause to the Commission on the grounds that the record is stale and should be brought up to date before a ruling on the merits is rendered. From our study of this exhaustive record we are convinced that we have before us a thorough exposition of the permanent conditions in the scrap brokerage industry here involved. Although the proceedings in this action of necessity have been prolonged, the solid overall picture presented by the record calls for a final decision thereon at this time and not for its return to the Commission.

We have reviewed at length the other objections raised by petitioners in their joint and individual briefs and find them without merit.

The order of the Federal Trade Commission will be affirmed in its entirety.