**BORDEN, INC., Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 79–3028.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 3, 1981.

Decided Feb. 24, 1982.

Rehearing Denied April 12, 1982.

500

H. Blair White, Sidley & Austin, Charles W. Douglas, Chicago, Ill., Walter W. Kocher, Borden, Inc., Harvey A. Rosenzweig, Edward A. Matto, Columbus, Ohio, for petitioner.

Edward F. Glynn, Jr., Michael N. Sohn, Gen. Counsel, Howard Shapiro, W. Dennis Cross, Jerold D. Cummins, F. T. C., Washington, D. C., for respondent.

Before KENNEDY and JONES, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

PHILLIPS, Senior Circuit Judge.

This case is before the court on a petition to review an order of the Federal Trade Commission, finding that Borden, Inc., the petitioner, violated § 5 of the Federal

Trade Commission Act, 15 U.S.C. § 45. The decision and order of the Commission are reported at 92 F.T.C. 669–833 (1978). The Commission found that Borden used unfair methods of competition in the sale of a reconstituted lemon juice product known as ReaLemon. The complaint charged unfair methods of competition through promotional pricing of ReaLemon in geographic markets where Borden faced competition from Golden Crown Citrus Corporation, a recent entrant into the reconstituted lemon juice business, with the unlawful intent to maintain ReaLemon's monopoly power.

The principal issues are (1) what is the relevant product market within which Borden's conduct should be assessed, (2) whether Borden possessed monopoly power within the relevant product market, (3) whether Borden's acts and practices in the sale of ReaLemon amounted to the illegal maintenance of its monopoly power, and (4) whether the Commission's remedy was related reasonably to the alleged unlawful practice it sought to curtail. For the reasons stated below, the court concludes that the findings of the Commission are supported by substantial evidence on the record and the prescribed remedy is within the power of the Commission. Accordingly, we affirm the opinion and order.

I

The ReaLemon business was begun in 1935. The original product was bottled lemon juice. Subsequently the product was changed to reconstituted lemon juice, made from lemon juice concentrate, water and a preservative. Reconstituted lemon juice was marketed successfully as a convenient substitute for fresh-squeezed lemon juice. Sometime in the 1940's the ReaLemon trademark was developed and used for the reconstituted lemon juice product. At that time ReaLemon was the only nationally advertised and distributed processed lemon juice, and its advertising during the 1940's and 1950's was aimed at converting users of fresh lemons to the ReaLemon product.

During the late 1950's and 1960's local business concerns began bottling reconstituted lemon juice in competition with ReaLemon on a regional basis. The emphasis of ReaLemon's advertising and pricing was changed in response to this competition. Sunkist was the only bottler of reconstituted lemon juice to attempt to compete with ReaLemon on a national basis, but in the late 1950's and early 1960's Sunkist retrenched to regional distribution. Since that time ReaLemon has remained the sole nationwide bottler and distributor of reconstituted lemon juice.

Borden purchased the ReaLemon-Puritan Company in 1962 for approximately $12.4 million. Borden has operated its wholly owned subsidiary as ReaLemon Foods.[1] At the time of the complaint, Borden had annual sales of over $2 billion, its 1972 income after taxes was $66 million, and it had assets of approximately $1.3 billion. In 1973 sales of reconstituted lemon juice by Borden's subsidiary totaled about $22 million, generating a net income of $3.5 million.

By comparison, Golden Crown Citrus Corporation was a small company based in Chicago in the late 1960's which produced and sold reconstituted lemon juice in the Chicago area. In 1969 Golden Crown embarked on a plan to expand its sales beyond Chicago to the midwest and later to other markets in the northeast and southeast. Golden Crown's method of expansion was to sell its product to retailers at prices well below those of ReaLemon. It relied almost entirely on its lower prices for its acceptance in other markets. The Commission found that retailers usually have only enough shelf space for two brands of reconstituted lemon juice and they generally limited their sales to ReaLemon and the brand of one lower priced competitor. Consequently, from 1969 through 1971 Golden Crown's expansion into other geographic areas succeeded mainly at the expense of other local

---

1. Since ReaLemon is a wholly owned subsidiary of Borden, their names are used interchangeably in this opinion.

competitors Golden Crown displaced on store shelves. In 1971, however, the significant price differential between Golden Crown and ReaLemon began to make inroads on the sales of ReaLemon. Borden's response to this competition from Golden Crown forms the principal basis of the FTC complaint charging Borden with unlawfully maintaining monopoly power in the production, distribution and sale of reconstituted lemon juice in the United States.

## II

On July 2, 1974, the FTC issued a complaint charging Borden with violations of § 5 of the Federal Trade Commission Act. Administrative Law Judge (ALJ) Daniel Hanscom conducted extensive hearings, received several thousand pages of exhibits and heard testimony from numerous economists and experts on behalf of Borden and the FTC.[2] On August 19, 1976, ALJ Hanscom issued a comprehensive initial decision finding that Borden had violated § 5.[3] The ALJ found that for purposes of analyzing Borden's conduct, the relevant product market was processed lemon juice.[4] Because of different product characteristics, and economic and commercial realities, the ALJ rejected Borden's contention that the relevant market included fresh lemons, finding instead that processed lemon juice was, at the least, a proper submarket.[5] Based upon Borden's share of the relevant market, the industry concentration ratios, ReaLemon's dominant brand name, its ability to command a premium price because of strong consumer preferences, ReaLemon's rate of return on its assets, Borden's substantial resource advantages, and ReaLemon's power to control prices and entry into the market, the ALJ further found that Borden possessed monopoly power within the processed lemon juice market.[6] He found Borden had maintained this monopoly power unlawfully through extensive promotions and price reductions in selected geographic markets where it faced competition from Golden Crown. He further found that the 32 ounce size ReaLemon[7] was sold to large grocery chains in Philadelphia and Buffalo at "unreasonably low prices." Because of the premium price the ReaLemon brand name commanded, ReaLemon's promotions and unreasonably low prices forced competitors either to sell their product at prices below their costs or lose their share of the market to Borden. The ALJ determined that these practices violated § 5, and ordered Borden to grant compulsory trademark licensing of the ReaLemon name and label design for ten years. The ALJ further ordered that Borden cease and desist from granting price reductions resulting in different net prices among ReaLemon customers competing in the same geographic area, selling ReaLemon below costs or at unreasonably low prices with the effect of hindering competition, and granting promotional allowances with the effect of hindering or eliminating competition.

Borden appealed the initial decision of the ALJ to the Commission. The opinion and order[8] of the Commission were filed November 7, 1978. The Commission adopted the factual findings of the ALJ, made further findings and modified the remedy. With respect to the relevant product market, the Commission disagreed with Borden's assertion that a submarket analysis

2. The hearings extended over a period of seven weeks, with testimony from 74 witnesses. The hearing transcript totaled over 6,000 pages with an additional 12 binders of exhibits.

3. *Borden, Inc.*, 92 F.T.C. 669 (1978).

4. Processed lemon juice was defined by the Commission as including reconstituted lemon juice, frozen reconstituted lemon juice, processed fresh lemon juice, frozen fresh lemon juice and imitation lemon juice. The geographic market was found to be the United States as a whole.

5. 92 F.T.C. at 675–702.

6. 92 F.T.C. at 702–718.

7. ReaLemon was sold in various sizes and containers but the 32-ounce size bottle was the primary concern of the F.T.C. complaint because this size was promoted heavily by Borden in competition with Golden Crown's 32-ounce size.

8. 92 F.T.C. 778.

was improper in a case involving the unlawful maintenance of monopoly power. Applying the criteria of *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Commission held that processed lemon juice constituted a valid submarket within which to analyze Borden's business practices and that fresh lemons were properly excluded.[9] The Commission also adopted the finding of the ALJ that Borden possessed monopoly power within the product market.

In finding that Borden unlawfully maintained its power through the predatory pricing of ReaLemon, the Commission found that neither Borden nor Golden Crown was appreciably more efficient than the other and that ReaLemon's sales in Buffalo and Philadelphia at "unreasonably low prices," without cost justification, were below its average total costs.[10] In order to overcome ReaLemon's significant premium price advantage, competitors such as Golden Crown had to price well below ReaLemon, and below their own average variable costs, to survive in the market. The Commission found that Borden had practiced predatory pricing with the intent to exclude an equally efficient competitor, Golden Crown.

The Commission modified the remedies proposed by the ALJ, by eliminating the requirement that Borden license the ReaLemon trade name. A majority of the Commission felt that the prohibition against unreasonably low prices was a sufficient means of dissipating Borden's illegally used monopoly power without resorting to the more drastic step of compulsory trademark licensing. In addition, the Commission narrowed the scope of the order of the ALJ by prohibiting price reductions resulting in different net prices among ReaLemon customers only in geographic areas where the price differences were not cost justified and in effect restrained or eliminated competition.

## III

It is to be emphasized that the present action is to review an order and opinion of the Commission—it is not a suit under the Sherman or Clayton Acts.

■ The Federal Trade Commission Act, authorizing the Commission to issue cease and desist orders, is "not a revenue-raising or a penal measure," *United States v. St. Regis Paper Co.*, 355 F.2d 688, 693 (2d Cir. 1966). To make effective its policy to preserve and promote competition, Congress "relied upon the initiative of administrative officials and the flexibility of the administrative process." *United States v. Morton Salt Co.*, 338 U.S. 632, 640, 70 S.Ct. 357, 362, 94 L.Ed. 401 (1950). Congress intentionally left § 5 broad and generally undefined, delegating power to the Commission to determine when practices violate the Act. The proscriptions in § 5 are flexible and are "to be defined with particularity by the myriad of cases from the field of business." *F. T. C. v. Colgate Palmolive Co.*, 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965). In *Atlantic Refining Company v. F. T. C.*, 381 U.S. 357, 367, 85 S.Ct. 1498, 1505, 14 L.Ed.2d 443 (1965), the Supreme Court emphasized the function of the Commission to deal with changing business practices as follows:

> Section 5 of the Federal Trade Commission Act declares "[u]nfair methods of competition in commerce, and unfair ... acts or practices in commerce ... unlawful." In a broad delegation of power it empowers the Commission, in the first instance, to determine whether a method of competition or the act or practice complained of is unfair. The Congress intentionally left development of the term "unfair" to the Commission rather than attempting to define "the many and variable unfair practices which prevail in commerce ...." S.Rep. No. 592, 63d Cong., 2d Sess., 13. As the conference report stated, unfair competition could

---

**9.** 92 F.T.C. at 784–88. The F.T.C. found that even without resort to the *Brown Shoe* submarket criteria, processed lemon juice was the relevant product market.

**10.** Commissioners Clanton and Pitofsky while concurring with the opinion of the Commission, proposed different tests for determining the maintenance of monopoly power.

best be prevented "through the action of an administrative body of practical men ... who will be able to apply the rule enacted by Congress to particular business situations, so as to eradicate evils with the least risk of interfering with legitimate business operations." H.R. Conf.Rep. No. 1142, 63d Cong., 2d Sess., 19. In thus divining that there is no limit to business ingenuity and legal gymnastics the Congress displayed much foresight. See *Federal Trade Comm'n v. Cement Institute*, 333 U.S. 683, 693 [68 S.Ct. 793, 799, 92 L.Ed. 1010] (1948).

*See also American Cyanamid Company v. F. T. C.*, 363 F.2d 757, 769 (6th Cir. 1966).

■ We turn now to the standards to be applied in reviewing the factual findings and conclusions of the Commission. While the ultimate responsibility for construing the FTC Act rests with the courts, "the determinations of the Commission, an expert body charged with the practical application of the statute, are entitled to great weight." *F. T. C. v. Texaco*, 393 U.S. 223 at 226, 89 S.Ct. 429 at 431, 21 L.Ed.2d 394.[11] The findings of the Commission are conclusive if supported by substantial evidence, *J. B. Williams Co. v. F. T. C.*, 381 F.2d 884, 891 (6th Cir. 1967), even though the evidence might also support a contrary finding. *American Home Products Corp. v. F. T. C.*, 402 F.2d 232, 237 (6th Cir. 1968). Our task is not to second guess the Administrative Law Judge and the Commission on questions of credibility and testimonial weight, *Charles Pfizer v. F. T. C.*, 401 F.2d 574, 584 (6th Cir. 1968), *cert. denied*, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453 (1969);[12] nor, as Borden advocates, are we to pick and choose among uncertain and conflicting inferences to be drawn from the evidence. *Safeway Stores, Inc. v. F. T. C.*, 366 F.2d 795, 800 (9th Cir. 1966), *cert. denied*, 386 U.S. 932, 87 S.Ct. 954, 17 L.Ed.2d 805 (1967).

The substantial evidence rule for reviewing an FTC order has been described as follows:

We have consistently reiterated—and we emphasize the point again now—that when Congress has vested in a Federal agency plenary authority to investigate and regulate particular forms of commercial or economic activity, entrusting it with primary responsibility for the resolution of complex and usually sharply disputed factual issues, appellate court review of the exercise of that authority is confined by the narrow perimeter of the substantial evidence rule. Findings of fact cannot and will not be set aside if the evidence in the record reasonably supports the administrative conclusion, even though suggested alternative conclusions may be equally or even more reasonable and persuasive. The findings must stand unless they were wrong, and they cannot be wrong—that is, reversibly wrong—if substantial evidence supports them.

(Footnotes omitted), *Colonial Stores v. F. T. C.*, 450 F.2d 733, 739–40 (5th Cir. 1971).

■ Thus Borden has the burden of persuading this Court that the evidence in the record is not sufficient to support the Commission's findings and conclusions. Borden argues that the testimony of certain witnesses on behalf of the FTC is not credible, that other inferences may be drawn from the voluminous testimonial and documentary evidence, and that the expertise of the Commission should be disregarded in reviewing its economic analysis of the conflicting definitions of predatory pricing advocated for this case. These arguments are contrary to the standards of review to be applied by this court. Congress has delegated to the Commission, an administrative agency possessing specialized knowledge of marketing techniques and sales practices, the initial responsibility of resolving the knotty, technical economic problems

---

11. *See also, Atlantic Refining Co., supra*, 381 U.S. at 368, 85 S.Ct. at 1505; *F. T. C. v. Cement Institute*, 333 U.S. 683, 720, 68 S.Ct. 793, 812, 92 L.Ed. 1010 (1948). Even when the Commission's findings are framed in terms of legal conclusions, their presumptive validity is con-

siderable. *Colonial Stores, Inc. v. F. T. C.*, 450 F.2d 733, 740 n. 14 (5th Cir. 1971).

12. *See also Guziak v. F. T. C.*, 361 F.2d 700, 703 (8th Cir. 1966), *cert. denied*, 385 U.S. 1007, 87 S.Ct. 712, 17 L.Ed.2d 545 (1967).

presented by Borden's conduct.[13] This court holds that the inferences drawn from the evidence by the Commission, and its findings and conclusions, are supported by substantial evidence.

## IV

■ The broad power of the Commission to determine whether a practice is unfair is "particularly well established with regard to trade practices which conflict with the basic policies of the Sherman and Clayton Acts even though such practices may not actually violate these laws." *F. T. C. v. Brown Shoe Co.*, 384 U.S. 316, 321, 86 S.Ct. 1501, 1504, 16 L.Ed.2d 587 (1966). Section 5 may be construed *in pari materia* with the antitrust laws, *American Cyanamid, supra*, 363 F.2d at 770, and the antitrust laws may serve as a guide or declaration of policy for the Commission to consider in determining what constitutes an unfair method of competition. *New Jersey Wood Finishing Co. v. Minnesota Mining & Mfg. Co.*, 332 F.2d 346, 351 (3rd Cir. 1964), aff'd, 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965); *Luria Brothers & Co. v. F. T. C.*, 389 F.2d 847, 859–60 (3rd Cir.), *cert. denied*, 393 U.S. 829, 89 S.Ct. 94, 21 L.Ed.2d 100 (1968).

Although it is well settled that methods of competition need not violate the Sherman or Clayton Acts in order to constitute a violation of § 5 of the Federal Trade Commission Act,[14] in the present case, the Commission seems to have restricted itself to a Sherman Act analysis, as indicated in the following language of its opinion:

> Although this case was brought and is decided under Section 5 of the FTC Act, it sounds basically in monopolization. Accordingly, the law under Section 2 of the Sherman Act is used to provide guidance for the application of Section 5, both

as to the issue of market definition and the substantive standard of illegality.[15] Although there is language in the majority decision of the Commission suggesting determination under the standards of the FTC Act unlimited by the strictures of the Sherman Act, the decision seems to rest primarily on the law of monopolization under the Sherman Act. At one point the opinion states:

> In light of these overriding policies we must determine whether Borden's maintenance of monopoly control over the processed lemon juice market was economically inevitable, or whether, like Alcoa, it "meant to keep, and did keep" that control over the market with which it started. *Id.* at 432.

> That Borden, in the words of the *Alcoa* court, "meant to keep" its monopoly share is evident from its marketing plans.[16]

> The Commission concluded that: "It can hardly be said that the maintenance of Borden's monopoly power was 'economically inevitable' .... Its maintenance was the result of a calculated strategy employing geographic price discrimination...." [17]

The ALJ relied upon Sherman Act cases to find Borden guilty of monopolization.[18] Commissioner Pitofsky stated in his concurrence that the decision of the Commission rests on the conclusion that Borden violated § 2 of the Sherman Act.[19]

■ We restrict our review of the Commission's decision to the Sherman Act § 2 grounds relied upon by it. *Industrial Union Department AFL–CIO v. American Petroleum Institute*, 448 U.S. 607, 631, n. 31, 100 S.Ct. 2844, 2858, n. 31, 65 L.Ed.2d 1010 (1980); *Securities and Exchange Commis-*

---

13. *See F. T. C. v. Texaco*, 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968).

14. *New Jersey Wood Finishing Co. v. Minnesota Mining & Mfg. Co.*, 332 F.2d 346, 351 (3rd Cir. 1964), aff'd, 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965); *Luria Brothers & Co. v. F. T. C.*, 389 F.2d 847, 859–60 (3rd Cir.), *cert. denied*, 393 U.S. 829, 89 S.Ct. 94, 21 L.Ed.2d 100 (1968).

15. 92 F.T.C. at 781, n. 4.

16. 92 F.T.C. at 795.

17. 92 F.T.C. at 802.

18. 92 F.T.C. at 767.

19. 92 F.T.C. at 826.

sion v. Chenery Corp., 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).

## V

The Commission's definition of the product market as processed lemon juice was crucial to its finding of maintenance of monopoly power. The inclusion of fresh lemons within the product market necessarily would preclude a finding of monopoly power because this would have reduced Borden's market share.[20] Borden contends that the undisputed facts establish that fresh lemons are reasonably interchangeable for every end use of ReaLemon, that the use of a submarket test under the Clayton Act is improper in a monopolization case, and that the evidence was not sufficient to support the finding that the processed lemon juice market did not include all other products containing lemon juice.

 Borden's contention that fresh lemons and ReaLemon are reasonably interchangeable emphasizes the similarity of the end uses of the two products, and de-emphasizes other factors such as price differences, low cross-elasticity of demand, and quality differences between fresh lemons and ReaLemon. However, under *United*

States v. E. I. DuPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (*Cellophane*), all of these factors are to be considered in assessing the reasonable interchangeability of products.[21] It is now well established that monopoly power is equated with the power to control prices or exclude competition.[22] As a consequence, in examining whether competition from other products prevents the possession of monopoly power, "[p]rice and competition are so intimately entwined that any discussion of theory must treat them as one." *Id.* at 392, 76 S.Ct. at 1005. In *Cellophane* the court discussed the reasonable interchangeability of products in terms of cross-elasticity of demand,[23] and in terms of comparative costs of the products to consumers.[24]

 The Commission's finding that low cross-elasticity of demand existed between fresh lemons and processed lemon juice is supported by the record. Buyers for large supermarket chains and representatives of processed lemon juice companies testified that price increases or decreases in fresh lemons had little or no effect on the prices or demand for processed lemon juice. This indicates they are in different competitive

**20.** Annual sales of fresh lemons were stated as approximately $200,000,000, and the inclusion of fresh lemons in the product market would reduce Borden's market share to less than ten per cent.

**21.** "[The] market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *Cellophane, supra,* 351 U.S. at 404, 76 S.Ct. at 1012.

**22.** *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Cellophane, supra,* 351 U.S. at 391, 76 S.Ct. at 1004.

**23.** "What is called for is an appraisal of the 'cross-elasticity' of demand in the trade." *Id.* at 394, 76 S.Ct. at 1006. The court examined the cross-elasticity of demand between cellophane and other flexible wrappings as follows:

An element for consideration as to cross-elasticity of demand between products is the responsiveness of the sales of one product to price changes of the other. If a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane it

would be an indication that a high cross-elasticity of demand exists between them; that the products compete in the same market. The court below held that the "[g]reat sensitivity of customers in the flexible packaging markets to price or quality changes" prevented du Pont from possessing monopoly control over price. [*U. S. v. E. I. DuPont De Nemours & Co.*] 118 F.Supp., at 207. The record sustains these findings. (*Footnotes omitted.*) *Id.* at 400, 76 S.Ct. at 1009.

**24.** "The Government stresses the fact that the variation in price between cellophane and other materials demonstrates they are noncompetitive. As these products are all flexible wrapping materials, it seems reasonable to consider, as was done at the trial, their comparative cost to the consumer in terms of square area." *Id.* at 400–01, 76 S.Ct. at 1009–1010.

Cellophane was found to cost two or three times as much as its chief competitor for the flexible wrapping market, but to cost less than several other forms of flexible wrapping. The Court found those differences in cost did not give DuPont monopoly power over prices.

markets. ReaLemon Foods' president testified that increased prices for fresh lemons for a typical year did not cause an increase in either ReaLemon sales or reconstituted lemon juice sales as a whole.[25] Representatives of several regional processed lemon juice distributors agreed that changes in the price of fresh lemons had little effect on the price of processed lemon juice.[26]

Testimony as to other important differences in the prices of fresh lemons and processed lemon juice support the Commission's finding of different markets. An executive vice president of a supermarket chain in the New York City area testified that the price of fresh lemons fluctuates on a weekly and even a daily basis.[27] Representatives of processed lemon juice companies stated that the prices of processed lemon juice are stable for long periods of time. Borden's own marketing plans, as well as testimony from other distributors, demonstrated that processed lemon juice prices were determined primarily in response to prices of competing brands of processed lemon juice. The Commission also considered the substantial price differences between fresh lemons and reconstituted lemon juice. One ounce of ReaLemon is roughly equivalent to the juice of one fresh lemon; thus, a 32 ounce bottle of ReaLemon is equivalent to the juice of about 32 lemons. Yet ReaLemon's 1973 marketing plan stated that the juice from fresh lemons costs between three and five times more than ReaLemon. Since ReaLemon sold at a premium price and competing brands consistently had to sell at lower prices, the price

differential between other brands and fresh lemons was even larger. Despite this substantial price gap, the volume of sales of fresh lemons is much greater than processed lemon juice and has not declined as processed lemon juice sales have grown over the years.

 Furthermore, the record supports the Commissioner's finding that ReaLemon is not reasonably interchangeable with fresh lemons. Borden asserts that ReaLemon may be substituted for each and every end use of the juice from fresh lemons. The *Cellophane* test, however, is not merely whether one product can be substituted for the use of another product, but whether products may be reasonably interchanged for the purposes for which they are produced when prices, uses, and qualities of the products are considered.[28] In *Cellophane* the court examined the flexible wrapping market for differences in quality as perceived by buyers of flexible wrapping and the degree to which those differences affected their buying decisions. 351 U.S. at 397–400, 76 S.Ct. at 1008–1009. If the quality differences between two products are such that consumers would not consider one product a viable substitute for another in making their purchasing decisions, regardless of whether one product actually can be substituted for the use of another, then these quality differences must be considered in determining the reasonable interchangeability of the products in a competitive market. The Commission considered the quality differences between fresh lem-

---

**25.** *See* Findings 32 and 33, 92 F.T.C. at 668–9.

**26.** Borden's claim of direct evidence contradicting the Commission's findings is insufficient. Borden points to testimony from only two witnesses to support its argument of price responsiveness between fresh lemons and processed lemon juice. One sales manager for a regional distributor stated that he "would be hazarding a guess" that a correlation existed between the lower price of fresh lemons and a decline in sales of his company's product during the same time period. The other witness, the president of a regional distributor, stated that a very high price for lemons will affect the movement of lemon juice in that "a housewife will have the option to buy lemon juice other than fresh

lemons." He also testified, however, that no correlation existed between retail fresh lemon prices and retail processed lemon juice prices.

**27.** *See* Finding 28, 92 F.T.C. at 683.

**28.** In *Cellophane*, the court stated that the competitive market for commodities depends on how different they are from one another in character or use, and "how far buyers will go to substitute one commodity for another." 351 U.S. at 393, 76 S.Ct. at 1006. It further noted that "[i]t is the variable characteristics of the different flexible wrappings" and the producers' marketing ability that determine choice. *Id.* at 402, 76 S.Ct. at 1011.

ons and processed lemon juice and found a number of undisputed differences which affect a consumer's purchasing decision. Documents from Borden, market studies, and testimony from numerous distributors showed that conspicuous differences are the greater convenience and storage capabilities of processed lemon juice over fresh lemons. Processed lemon juice is available for immediate use while fresh lemons must be squeezed for the juice. Processed lemon juice may be stored for long periods; ReaLemon may last from six months to a year if refrigerated. In contrast, fresh lemons are perishable, will spoil within a relatively short time, and must be replenished constantly if used frequently. Other quality differences affecting consumer buying decisions concern taste and decorative uses. Borden's marketing plans recognized that, notwithstanding the convenience and economic factors, it would be difficult to convert many consumers of fresh lemons to ReaLemon because of a strong preference for the taste of fresh lemons. A marketing study done for Borden in 1972 concluded on the basis of interviews with consumers that the chief reason consumers used fresh lemon juice was its superior flavor.[29] Borden's marketing plans also recognized that the presence of chemical additives in ReaLemon distinguished it from fresh lemons. Finally, an obvious difference between fresh lemons and processed lemon juice which affects consumer selection is the ornamental or decorative uses of fresh lemons, such as a lemon wedge for iced tea, a slice of lemon to garnish fish or other dishes, a twist of lemon peel to decorate drinks, and grated lemon peel for recipes. The evidence demonstrated that restaurants commonly use fresh lemons for such purposes, and even consumers of processed lemon juice felt that fresh lemons should be used when entertaining guests. These demonstrated quality differences between fresh lemons and processed lemon juice further support the Commission's finding that, considering price, use and quality, fresh lemons were not reasonably interchangeable with processed lemon juice.

 In conjunction with the reasonable interchangeability test of *Cellophane*, the Commission applied the submarket test of *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962),[30] to conclude that processed lemon juice is a valid submarket within which to assess the allegations of the complaint. Borden contends that the Commission erred in applying the *Brown Shoe* test because it relates to relevant markets for Clayton Act anti-merger cases rather than for Sherman Act monopolization cases. Basically Borden maintains that in a proceeding under the more flexible provisions of § 5 of the FTC Act, the Commission may apply only the reasonable interchangeability test of *Cellophane* if the maintenance of unlawful monopoly power is alleged. We reject this contention for two reasons. First, the Commission did not "ignore the dictates of *Cellophane*" and apply exclusively the *Brown Shoe* submarket criteria, as claimed by Borden. On the contrary, the Commission relied on a synthesis of both tests for guidance in determining whether Borden's conduct violated § 5. Second, the Supreme Court has recognized that submarkets, as separate economic entities, may be found in

---

**29.** *See* Finding 19, 92 F.T.C. at 679, and the many comments from consumers quoted therein.

**30.** The Court in *Brown Shoe* explained the definition of a submarket as follows:

The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for anti-trust purposes. *United*

*States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593–595 [77 S.Ct. 872, 877–878, 1 L.Ed.2d 1057]. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. (*Footnotes omitted.*) 370 U.S. at 325, 82 S.Ct. at 1523.

Sherman Act cases as well as Clayton Act cases, and there is "no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act." *United States v. Grinnell Corp.*, 384 U.S. 563, 573, 86 S.Ct. 1698, 1705, 16 L.Ed.2d 778 (1966). This court has recognized that a submarket analysis may be appropriate in a Sherman Act monopolization case. *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 859, n. 41 (6th Cir. 1979).[31] We hold that the use of submarket criteria is appropriate to define the relevant market in the present case dealing with the unlawful maintenance of monopoly power under § 5 of the FTC Act.[32]

Borden further attacks the relevant product market finding of the Commission on the ground that the Commission erred in excluding from the processed lemon juice market lemonade and a lemon-based mixer for cocktails. In arguing that processed lemon juice contains more than the five products included by the Commission in the relevant product market, *supra*, n. 4, Borden questions the credibility of an economist testifying for the FTC, and claims that numerous other witnesses described the competition between processed lemon juice and lemonade. The testimony relied upon by Borden is inconclusive. As to whether reconstituted lemon juice competes with lemonade, one company representative (Kendall, Kendall Foods) stated that it was a very hard relationship to know, and he

"just had a feel for it." Another company representative (Wolcott, Seneca Foods) stated he could speak only from his personal use as a consumer as to whether reconstituted lemon juice competes with lemonade. The opinion of a third company representative (Greenburg, Penn Fruit) was that lemonade competes with reconstituted lemon juice only during the summer months. A fourth representative (Fey, Minute Maid) thought that all lemon-flavored products compete to a certain degree. This contradictory testimony cited by Borden is insufficient to support a conclusion that the Commission's definition of the processed lemon juice market is not supported by substantial evidence.

Furthermore, Borden points to evidence of interchangeability between processed lemon juice and lemonade for only one particular end use, the making of lemonade. It cites no evidence of interchangeability with processed lemon juice for other uses, such as in recipes and iced tea. Similar shortcomings apply to the argument that lemon-based cocktail mixes should be included in the processed lemon juice market. The record viewed as a whole substantially supports the Commission's definition of the processed lemon juice market, and this court concludes that the defined market was appropriate for examining Borden's conduct under § 5.

### VI

Having considered the relevant product market, we now must determine

---

**31.** *See also Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 27 n.11 (3rd Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); *Greyhound Computer Corp. v. I. B. M. Corp.*, 559 F.2d 488, 494 n.7 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964, 980 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).

**32.** *See L. G. Balfour Co. v. F. T. C.*, 442 F.2d 1, 11 (7th Cir. 1971). Apparently Borden does not seriously contest the finding that processed lemon juice is a relevant submarket if the submarket criteria may be applied here, and properly so because substantial evidence supports the Commission's finding that processed lemon juice is a submarket.

In addition to the previously discussed differences in qualities, uses, and prices, the Commission found that industry members recognized the processed lemon juice market as a separate and distinct economic entity. This recognition was reflected in the pricing policies of industry members, their marketing strategies, and the marketing of fresh lemons without regard for the availability of processed lemon juice. Furthermore, there are differences in the production of fresh lemons, which are cleaned and processed as fresh produce, and processed lemon juice, which goes through a manufacturing and bottling process. The channels of distribution are also different, with fresh lemons sold through produce brokers and wholesalers, while processed lemon juice is sold through grocery brokers or salesmen.

whether substantial evidence supported the Commission's finding that Borden possessed monopoly power within the market. The existence of monopoly power may be inferred from a predominant share of the market. *United States v. Grinnell*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Such an inference, however, "does not have to follow automatically. Only a careful factual analysis of the market in question will reveal whether monopoly power, in fact, exists." *Byars v. Bluff City News Co., supra*, 609 F.2d at 850–51. While the Commission stressed Borden's dominant market share, it also relied on several other factors indicating ReaLemon possessed monopoly power within the market.

■ Borden's market share was substantial, at times amounting to almost 90% of the market nationwide, and over 95% in some large metropolitan areas. Much of the statistical data used by the Commission in determining market shares came from Borden's own documents and marketing plans.[33] From 1969 through 1974 Borden's national market share ranged from 88% to 75.3% on a liquid volume basis, and from 91.8% to 88.9% on a dollar basis. Borden's 1971 Marketing Plan for ReaLemon estimated its market share at 92%, the 1972 plan estimated 90%, and the 1973 plan put it at 88%. Although these market shares are more than sufficient to infer monopoly

power,[34] the Commission looked to other factors evidencing Borden's power to control prices or exclude competitors in the market.

■ While maintaining a dominant share of the market for extended periods of time, Borden consistently was able to charge a higher price and reap greater profits for ReaLemon than were others marketing processed lemon juice. The Commission found that Borden charged a premium price, sometimes over 30 per cent more than the price of other brands, even though no objective differences in quality existed between ReaLemon and any of the other brands of processed lemon juice.[35] ReaLemon's premium price was attributed to successful product differentiation. Witnesses from the industry and grocery business testified that ReaLemon was "almost generic" or "synonymous" with reconstituted lemon juice. Borden maintained this successful product differentiation through extensive advertising: ReaLemon was the only nationally advertised processed lemon juice and was the only significant advertiser in the industry until 1972 when Golden Crown began advertising on a minor scale in selected markets.

A highly successful brand name and product differentiation achieved through extensive advertising over the years, standing

---

**33.** For example, the 1973 ReaLemon Marketing Plan showed the following market shares on a dollar basis:

| | Year Ending 12/25/70 | Year Ending 12/24/71 | 7 Months Ending 8/4/72 |
|---|---|---|---|
| REALEMON | 91.8 | 91.4 | 88.0 |
| GOLDEN CROWN | 1.4 | 2.4 | 5.5 |
| SENECA | 2.0 | 1.5 | 1.1 |
| SUNKIST | 2.1 | 1.7 | 1.4 |
| VITA PAKT | .4 | .5 | .4 |
| TREESWEET | .5 | .4 | .4 |
| ALL OTHERS | 1.8 | 2.1 | 3.2 |
| TOTAL | 100.0 | 100.0 | 100.0 |

Borden now claims that this statistical data is unreliable and inaccurate, a position obviously inconsistent with its previous reliance upon this data in formulating its strategy and marketing plans for ReaLemon. ReaLemon management used the market share figures of a recognized and well established independent market research organization. Borden's data on its market share was substantially corrobo-

rated by market share figures compiled by complaint counsel from data obtained from firms marketing processed lemon juice. *See* Findings 71–76, 92 F.T.C. at 702–07.

**34.** Although the ReaLemon market share showed some decline from 1969 through 1974, this decline is not necessarily inconsistent with a finding of monopoly power. *American Tobacco Co. v. United States*, 328 U.S. 781, 794–95, 66 S.Ct. 1125, 1132, 90 L.Ed. 1575 (1946); *Greyhound Computer Corp., supra*, 559 F.2d at 496 n.18.

**35.** In the 1972 Marketing Plan, the president of ReaLemon Foods stated that from a technical standpoint, ReaLemon had "no apparent advantage over the juice of any of its competitors. Processed lemon juice is processed lemon juice ..." Other ReaLemon market plans, actual prices, and market shares support the finding that ReaLemon commanded a premium price for a basically fungible product.

alone, does not create a presumption of monopoly power. When a seller possesses an overwhelmingly dominant share of the market, however, and differentiates its product from others through a recognized and extensively advertised brand name, thereby enabling the seller to control prices or unreasonably restrict competition, then monopoly power may be found to exist. Both ReaLemon and its competitors acknowledged ReaLemon's premium price, the need for competitors to price their products low enough to overcome this premium price in order to maintain or increase their market share, and the ability of ReaLemon to preserve its dominant market share through the manipulation of this premium price gap. Through selective promotional allowances Borden could adjust its net wholesale prices to retailers and control price competition at the wholesale level of distribution. The evidence indicated Rea-Lemon's successfully differentiated brand name, extensive advertising and ability to command a premium price also acted to some degree as a barrier to entry into the processed lemon juice market.[36]

The Commission also considered the rate of return on ReaLemon's assets realized by Borden. The total purchase price for Rea-Lemon in 1962 was $12,370,514, but its adjusted net worth was $2,767,619. The parties characterized the $9,602,895 difference as a discount of future earnings or as a "goodwill" cost. In computing ReaLemon's rate of return on its assets, the ALJ excluded the $9.6 million, but Borden argues it should be considered as an asset. If excluded, ReaLemon's rate of return ranged from 16.9% to 35.2% during 1968–73, nearly four and one-half times the average rate of return for the food and kindred products industries. If included, its rate of return ranged from 8.1% to 10.2% during the same period, about one and one-half times the rate of return for the food and related products industries. Regardless of how the $9.6 million is characterized, Borden's rate of return on ReaLemon's assets supports rather than contradicts the Commission's finding of monopoly power.

A final aspect of Borden's position in the market structure relied on by the Commission was ReaLemon's substantial resource advantage over its competitors. ReaLemon had far greater resources to finance expenditures on advertising,[37] and promotions[38] than did its nearest competitor. It conducted a strong nationwide public relations program and, through other Borden food products, it could participate in tie-in advertising and cross-couponing. The weaker resource bases of ReaLemon's competitors rendered them unable to engage in such activities. Looking to the evidence as a whole, and in particular to the evidence of Borden's market share combined with its brand name strength, we hold that the Commission's finding of monopoly power is well supported by the record.

VII

We next review the Commission's finding that Borden restrained competition in violation of § 5 of the FTC Act by unlawfully maintaining its monopoly power. Borden's mere possession of lawfully acquired monopoly power in the processed lemon juice market is not per se unlawful. *Standard Oil Co. v. United States*, 221 U.S. 1, 62, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). One who possesses monopoly power violates the Sherman Act through "the wilful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell, supra*, 384

---

**36.** *See* Findings 96–100, 92 F.T.C. 716–18, quoting testimony from economist Dr. Michael Mann and from the presidents of two regional processed lemon juice companies.

**37.** The Commission found that ReaLemon spent more than $5,000,000 on advertising between 1969 and 1974. ReaLemon's 1972 Marketing Plan projected its 1971 advertising ex-

penditure at $629,100. In comparison advertising by competing brands in that year was almost non-existent.

**38.** For example, ReaLemon's promotion budget for 1973 was $2,805,000. *See* Finding 71, 92 F.T.C. at 715.

U.S. at 570–71, 86 S.Ct. at 1703–1704. It is the use of monopoly power to foreclose competition or gain a competitive advantage that is unlawful. *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). Predatory conduct by one possessing monopoly power, such as below-cost pricing or price discrimination, is generally required to find a violation of the Sherman Act. It is not essential to a finding of monopolization, however, that acts or practices used to maintain monopoly power be in themselves independently unlawful. *United States v. Griffith*, 334 U.S. at 105, 68 S.Ct. at 944; *United States v. Aluminum Co. of America*, 148 F.2d 416, 431–32 (2nd Cir. 1945). Nor is it always necessary to find a specific intent to restrain trade or monopolize, *Griffith, supra*, 334 U.S. at 105, 68 S.Ct. at 944, for a general intent to monopolize is all that is ordinarily required to find a § 2 Sherman Act violation. *Byars v. Bluff City News Co., Inc., supra*, 609 F.2d at 859. The Commission found ReaLemon's marketing strategies, pricing, and promotional practices were predatory in nature and evidenced an intent to maintain its monopoly power unlawfully. These practices included marketing plans implemented to maintain ReaLemon's monopoly power, pricing and promotional allowances without cost justification in selective geographic areas where Borden faced heavy competition, and sales below cost or at unreasonably low prices with the intent to exclude competitors from the market.

 In the present case the record contains direct evidence of Borden's general intent to exercise and maintain its monopoly power. ReaLemon's marketing plans for 1971–74 mapped out the actions to be taken to maintain its market share and restrain competition from the expansion of Golden Crown and other competitors.[39] Golden Crown was the first competitor to challenge seriously ReaLemon's market dominance. As previously mentioned, Golden Crown's initial market gains came from the market shares of other competitors more than from ReaLemon's. It is to be reemphasized that it was when Golden Crown began to show successful encroachment on ReaLemon's market share that ReaLemon began to react, as its 1971 Marketing Plan indicates.

The 1971 plan proposed heavy emphasis upon the ReaLemon brand name through advertising, and depended on the strong familiarity with the brand name as a justification for obtaining a higher price. The 1971 plan further proposed to forego price increases planned to offset higher costs, and to sacrifice short-term profits to maintain its market share. ReaLemon also switched its method of granting promotional allowances, nearly doubling promotional allowances in geographic areas where competition existed, such as on the East Coast, while limiting promotional allowances in non-competitive areas. A specific objective of the 1972 Marketing Plan was combatting low-priced competition, and the primary weapons were promotional allowances on a selective geographic basis and increased advertising. The promotional allowances brought about reductions in ReaLemon's regular retail price by 10 cents or more per 32-ounce bottle.

The 1973 Marketing Plan was more explicit in stating ReaLemon's intention to maintain its monopoly power over the processed lemon juice market through exclusionary conduct. A major objective of the

**39.** Interestingly, Borden attacks the credibility of its own marketing plans and internal documents, contending they are untrustworthy, mere proposals, and not substantial evidence of Borden's actions. This argument might be meritorious if the portion of the marketing plans taken alone and out of context were relied upon as evidence of Borden's intent. *See Timken Roller Bearing Co. v. F. T. C.*, 299 F.2d 839, 842 (6th Cir.), *cert. denied*, 371 U.S. 861, 83 S.Ct. 118, 9 L.Ed.2d 99 (1962). However, other evidence and testimony corroborated the marketing plans and documents, demonstrating that these plans guided ReaLemon's conduct in the market. Nor were the stated intent and objectives of these plans taken out of context. A major theme running throughout them was Borden's intent to use selective price promotions to restrain and discipline vigorous price competition. Finally, the marketing plans cannot be construed as "puffery" meant to impress superiors, for the president of ReaLemon contributed to the plans and they were used by management to direct company sales.

plan was to raise ReaLemon's market share from an estimated 86.5% nationwide back to 89.0%. This objective was aimed not only at the Golden Crown market share, "but against the share of all brands other than ReaLemon." Again, the main tools for achieving this objective were selective trade deal promotions and substantial advertising, with promotional spending concentrated in heavily competitive markets for the stated purpose of reversing competitive gains. In particular, to combat Golden Crown inroads ReaLemon sought to reduce the price differential through promotional deals.

The last marketing plan relied on by the Commission, the 1974 plan, substantially increased the budget for overall advertising and promotional allowances, but only offered increased promotional allowances in the most competitive geographic areas.[40] A stated objective of the plan was to increase ReaLemon's market share in 4 key districts[41] with high per capita lemon juice consumption, where Golden Crown had been most successful. The plan noted that these 4 districts accounted for an estimated 54.7% of Golden Crown's sales for 6 months of 1973. The objective of the plan was to reduce Golden Crown's share from 18% to 14% in 1974, and increase ReaLemon's share from 71% to 75%. These 4 areas were selected because they represented areas of high development of Golden Crown, and the plan stated that decreasing Golden Crown's effectiveness in these markets "may result in significant reduction of expansion leverage." Trade deals in these 4 areas were to be continued at high levels, whereas deals in other areas were to be reduced. In addition to these heavy promotions in selected areas, ReaLemon dropped planned price increases in the markets where Golden Crown was competing, but instituted price increases elsewhere. Testimony from ReaLemon's regional sales manager, and internal documents and correspondence from ReaLem-

on's regional and national sales managers demonstrated that these marketing plans were vigorously implemented, and their purposes and objectives were exactly as stated.[42]

These marketing plans, internal documents, and conduct conforming to the plans provided direct evidence of ReaLemon's intent not only to maintain its monopoly power in the market, but also to increase its market share, reduce the shares of Golden Crown and other competitors, and stifle any further expansion or competitive efforts by Golden Crown. ReaLemon's tactics and conduct went beyond a simple, healthy competitive response by a monopolist to price competition. Rather, they evidenced a concerted effort to restrict competition unreasonably and maintain its monopoly power.

The price reductions and promotional allowances in selected geographic markets enabled Borden to receive monopoly profits in areas of little competition, and then use these profits to subsidize price reductions in areas of intense competition. As the only nationwide distributor of processed lemon juice enjoying strong brand recognition and premium price profits, Borden was in the unique position of being able to withstand extended periods of reduced prices and promotional allowances in selected geographic markets. Thus, Borden's conduct had the effect of deterring entry and restricting the ability of competitors to expand into other geographic areas. These selective geographic promotions were intended to confine and discipline smaller regional distributors because of their vigorous price competition and cannot be characterized as competition on the merits exempt from the proscriptions of § 5 of the FTC Act.

Another finding by the Commission demonstrating Borden's intent to maintain its monopoly power was that Borden sold

---

**40.** These greater promotional allowances were granted in the Northeast despite the fact that evidence indicated ReaLemon's manufacturing costs were greater there. The greater promotional allowances could not be attributed to lower distribution costs.

**41.** The four key districts listed in the plan were New York, Philadelphia, Chicago, and Detroit.

**42.** *See* quotes from correspondence and reports of ReaLemon's sales managers in Findings 128–30, 92 F.T.C. 729–32.

ReaLemon below cost or at unreasonably low prices in Philadelphia and Buffalo with the effect of injuring competition.[43]

The Commission made reference to the economic definitions of predatory pricing proposed by Professor Richard Posner[44] and Professors Areeda and Turner[45] but did not make a decision as to which rule correctly defines the term. With reference to the Areeda-Turner rule, the Commission said: "It is not necessary to decide whether this is the exclusive, or even the preferred test for predatory pricing.... However, the ALJ and the parties both utilized this approach, and we find it a useful one for illuminating the issue."[46]

Like the Commission, we do not find it necessary to decide which of the two rules, Posner's or Areeda-Turner's,[47] should be applied in the present case in determining whether Borden's pricing was predatory.

This case presents the unique situation of a monopolist marketing a product which could command a premium price, giving it significant pricing leverage over its competitors. ReaLemon historically has dominated the processed lemon juice market and has affected competition adversely through selective geographic price promotions and unreasonably low prices. The record supports the Commission's conclusion that Borden intended to continue its domination with the same long term effect of reducing or eliminating competition.

We conclude that when a monopolist, through brand identification or other-

---

**43.** The sales in Philadelphia were to Acme Markets, the largest supermarket chain in the city with 20% to 28% of the retail grocery market. The sales in Buffalo were to Niagara Frontier Services, owner of the largest volume supermarkets in the area. Due to limited shelf space and the large promotions offered these customers by Borden, the Commission found that the short-term effect was that they were unable to buy from Borden's competitors.

**44.** R. Posner, *Antitrust Law: An Economic Perspective*, 188 (1976).

**45.** P. Areeda and D. Turner, Antitrust Law, § 715b (1978); *see also* Areeda and Turner, *Predatory Pricing and Related Practices under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975).

**46.** 92 F.T.C. 799, n. 29.

**47.** Reference is made to an article by Professors Joskow and Klevorick, *A Framework for Analyzing Predatory Policy*, 89 Yale L.J. 213 (1979), proposing a two-tier rule-of-reason approach to determining whether pricing is predatory. They formulate a rule which assesses long-run conditions, for "such an assessment is required because the essence of predatory pricing is the alleged predator's sacrifice of short-run gains for greater long-run gains." *Id.* at 217. The first tier would examine the structural characteristics of the market and the market power of the alleged predator to determine if they generate a reasonable expectation that predatory pricing could occur which would impose significant economic losses on society. Among the structural factors Joskow and Klevorick would consider is the following:

> Second, we should seek to determine whether the existing dominant firm has been successful in establishing a significant

"brand preference" in the eyes of consumers, not by producing an objectively better product, but by having been first in the market or by having made extensive "image" advertising expenditures. Faced with such a market, an entrant not only may have to invest the resources that are technically required to establish production and distribution networks but also may have to undertake substantial promotional expenditures, both to get its product known and to overcome brand loyalties that the dominant firm has achieved. In such situations, successful entry will be more costly and more time-consuming, and, as a result, potential competition will be a less effective constraint on the existing dominant firm. As a result, courts should recognize that because generic names and premium brand images induced by advertising change the conditions of entry in such a way that potential competition is a less effective constraint on prices than it otherwise might be, dominant firm behavior in such markets may be worthy of closer scrutiny.

In those cases where the firm and market structural characteristics suggested that efficiency losses are likely to be high if there is a failure to identify pricing which is predatory, then the second tier of the analysis would be applied. *Id.* at 249. This second tier would more closely examine a firm's pricing behavior, and would allow for a more flexible approach in applying the various cost-based rules. The Joskow-Klevorick proposal combines some of the advantages of the *per se* cost-based rules in that it is a workable rule which can be applied by the courts, and some of the advantages of flexibility in the broader Scherer and Posner rules. This article was published after the Commission's opinion was issued.

wise, can and does manipulate prices in such a way as to exclude equally efficient competitors by requiring them to sell below their average variable costs, such price manipulation is an unreasonable use of power to maintain the monopolist's market position. The record supports the conclusion that Borden is a monopolist and undertook these actions. Accordingly, the Commission was authorized to hold that these actions violate the Sherman Act § 2 and the FTC Act § 5.

## VIII

The final issue raised in Borden's petition concerns the propriety of the Commission's cease and desist order. Borden alleges that the order amounts to an absolute ban against selective price reductions in response to competition, and therefore deprives Borden of the "meeting competition" defense to which it is entitled. Additionally, Borden alleges that the prohibition on sales below cost, or at unreasonably low prices which have the effect of hindering or restraining competition, is too vague and unenforceable. Respondent FTC replies that the order need not provide a "meeting competition" defense under the Robinson-Patman Act where Borden was guilty of monopolizing, for a monopolist may be found to have violated § 2 of the Sherman Act whether or not a Robinson-Patman violation is established. Finally, the FTC responds that the order is as specific as the circumstances permit, and sufficiently clear to avoid raising serious questions as to its meaning and application.[48]

 The Commission has wide discretion in determining the kind of order necessary to cope with the unfair practices found. *F. T. C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 392, 85 S.Ct. 1035, 1046, 13 L.Ed.2d 904 (1965); *F. T. C. v. National*

*Lead Co.*, 352 U.S. 419, 428, 77 S.Ct. 502, 508, 1 L.Ed.2d 438 (1957).[49] Because Congress has placed upon the Commission the primary responsibility for shaping remedies, the courts should not "lightly modify" the Commission's order. *F. T. C. v. Colgate-Palmolive Co., supra*, 380 U.S. at 392, 85 S.Ct. at 1046. The courts should "interfere only where there is no reasonable relation between the remedy and the violation." *Atlantic Refining Co. v. F. T. C.*, 381 U.S. 357, 377, 85 S.Ct. 1498, 1510, 14 L.Ed.2d 443 (1965); *P. F. Collier & Son v. F. T. C.*, 427 F.2d 261, 276 (6th Cir.), *cert. denied*, 400 U.S. 926, 91 S.Ct. 188, 27 L.Ed.2d 186 (1970).

 The first paragraph of the Commission's order prohibiting any price discrimination, not justified by cost differentials, in any geographic area that adversely affects competition, is reasonably related to Borden's unlawful conduct which the Commission has sought to curtail. As stated earlier, Borden's selective geographic promotions and price cuts were its primary tools in hindering competition from smaller regional competitors. No other competing processed lemon juice had the broad national base of Borden, or the ability to remain competitive in the face of Borden's sustained price reductions and promotions in a particular market area. The Commission noted the long-run anti-competitive consequences of this conduct to consumers, in that once Borden eliminates the threat of entry from a regional competitor or disciplines a competitor to cease its price competition, Borden may recoup its short-term reduced profits or losses by raising prices back to monopolistic levels. Borden thus would be able to maintain its monopoly power and consumers would be left with a limited selection and high monopoly prices. The Commission's remedy prohibiting these selective geographic price reductions and

---

**48.** The FTC also argues that Borden failed to object to the remedies before the Commission, and raises these objections for the first time in this Court. It appears that the objections in issue were at least indirectly raised before the Commission, and they have been considered by this Court.

**49.** This wide latitude is based on the Commission's "expertise in determining what is necessary to eliminate unfair practices and its administrative responsibilities to devise remedies according to a consistent statutory policy." *Standard Oil Co. of Cal. v. F. T. C.*, 577 F.2d 653, 662 (9th Cir. 1978).

promotions unless cost-justified is a reasonable means of stopping Borden's unlawful conduct.

■ We disagree with Borden's contention that the order improperly denies it the "meeting competition" defense. Under the order, Borden still may make overall price reductions to meet competition in particular geographic areas. Additionally, it is well established that the Commission "has the authority to restrict otherwise lawful practices and activities when they are likely to be used to carry out an unlawful purpose." *Arthur Murray Studio of Washington, Inc. v. F. T. C.*, 458 F.2d 622, 625 (5th Cir. 1972). See also *F. T. C. v. National Lead Co., supra*, 352 U.S. at 430, 77 S.Ct. at 509; *American Cyanamid Company, supra*, 363 F.2d at 771; *Sandura Co. v. F. T. C.*, 339 F.2d 847, 861 (6th Cir. 1964). The Commission "must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity." *F. T. C. v. National Lead, supra*, 352 U.S. at 429, 77 S.Ct. at 509. The prohibited goal was Borden's unlawful maintenance of its monopoly power. To permit it to reduce prices in competition with smaller regional sellers while maintaining high monopoly prices and profits elsewhere, would be to permit the very practice used to carry out its unlawful purpose. The FTC had the authority to restrict this practice, even though it might otherwise be lawful.

■ Finally, Borden alleges the order is so vague as to be unenforceable. Borden focuses solely on the language prohibiting ReaLemon from selling "below its cost or at unreasonably low prices." In this regard, the Supreme Court has said an FTC order must be "sufficiently clear and precise to avoid raising serious questions as to [its] meaning and application." *F. T. C. v. Colgate-Palmolive Co., supra*, 380 U.S. at

392, 85 S.Ct. at 1046. When considered in the context of the complaint and opinion from which it arose, the language to which Borden refers is sufficiently clear and precise.[50]

The prohibition against selling "below its cost" refers to selling below ReaLemon's average total cost, and "unreasonably low prices" refers to sales made at or near average costs with the intent to restrain unreasonably competition from Golden Crown and others, as the opinion clearly demonstrates.[51] The Commission explained in the remedy portion of its opinion that "whether a price is 'unreasonably low' must be determined by reference to Borden's own costs, its awareness of its competitors' costs, historic price differentials, and competitive conditions in the market."[52] With such knowledge, Borden can determine whether its pricing policies will put it in a zone of danger with respect to the FTC ruling. Accordingly, the onus of compliance is in its proper place.

We affirm and enforce the Commission's order.

CORNELIA G. KENNEDY, Circuit Judge, dissenting.

The majority affirms the FTC's ruling that Borden engaged in monopolization in violation of section 2 of the Sherman Antitrust Act. I respectfully dissent.

Although all reconstituted lemon juice is chemically alike, the FTC found that a strong consumer preference existed for Borden's ReaLemon brand because Borden successfully differentiated ReaLemon from other brands in the minds of consumers through heavy promotion of the ReaLemon trademark. *Borden, Inc.*, [1976–1979 Transfer Binder] Trade Reg.Rep. (CCH) ¶ 21,490 at p. 21,496. The FTC found that the consumer preference enabled Borden to

---

**50.** Although the order is sufficiently precise, Borden may still take advantage of the Commission's procedures for advising a respondent whether its proposed conduct violates the order. Concern that hypothetical conduct might violate the order is an insufficient reason for modification. *See F. T. C. v. National Lead Co., supra*, 352 U.S. at 431, 77 S.Ct. at 510;

*Luria Brothers & Co. v. F. T. C., supra*, 389 F.2d 847, 862 (3rd Cir.), *cert. den.*, 393 U.S. 829, 89 S.Ct. 94, 21 L.Ed.2d 100 (1968).

**51.** *See* 92 F.T.C. at 800–01, 804–05.

**52.** 92 F.T.C. at 807 n.41.

charge significantly more for ReaLemon than consumers were willing to pay for competing products.[1] *Id.* It also found that Borden had monopoly power in the reconstituted lemon juice market. *Id.* at 21,501–21,503.

ReaLemon faced increased competition in the late 1960's. The FTC found that Borden deliberately set out to defeat this competition, to maintain or increase its market share. *Id.* at 21,504–21,505. In furtherance of this goal Borden promoted the ReaLemon brand even more heavily. The Commission found that Borden also priced ReaLemon at or near its costs. Because of the price premium ReaLemon commanded—created by the consumer preference—Borden's competitors were forced to price their competing products below their own costs. The FTC called this "unreasonably low" pricing. *Id.* at 21,511, together with 21,509–21,510. The Commission found that Borden practiced such unreasonably low pricing only in those markets where competition was stiff.

The FTC concluded that under section 2 of the Sherman Act a monopolist may only maintain its power through means that are "economically inevitable." *Id.* at 21,504, 21,508, 21,510. It ruled that Borden's selective unreasonably low pricing in a deliberate attempt to maintain or increase its market share constituted monopolization under section 2, and thereby violated section 5 of the FTC Act. *Id.* at 21,510. The majority upholds this ruling. In addition to the grounds relied on by the Commission, the majority relies on alleged below cost sales by Borden and states that Borden used its monopoly profits in markets where it faced little competition to subsidize price reductions in markets where the competition was stiff. Majority op. at 514. One cannot tell from the majority's opinion the relative importance of any one of these grounds for its holding.

Although it upholds the Commission's result the majority does not adopt the Commission's definition of monopolization as competitive conduct by a monopolist that is not "economically inevitable." Rather, as the majority recognizes, the otherwise lawful conduct forbidden by section 2 of the Sherman Act is a monopolist's use of *monopoly* power in order to maintain or improve its position in the market. *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894, 926–927 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); majority op. at 512–513 (emphasis added). Not every exercise of market power by a monopolist is a use of monopoly power. Monopoly power is power that a firm possesses by virtue of its monopoly position in the market, not power that it has because of, for instance a superior product. A use of monopoly power that is unreasonably anti-competitive violates the Sherman Act. *See Byars v. Bluff City News Co.*, 609 F.2d 843, 853 (6th Cir. 1979). However, growth or development as a consequence of a superior product, business acumen, or historic accident, even by a monopolist, does not violate the Act. *United States v. Grinnell*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966).

Since monopolization is the unreasonably anti-competitive use of monopoly power, the only intent that could be relevant to a charge of monopolization is an intent to use monopoly power in an unreasonably anti-competitive manner. There is no proof that Borden had such an intent here. Borden surely meant to obtain as much of the reconstituted lemon juice market as it could, but that is the very essence of normal competition, a goal that we approve even for a monopolist. Despite the majority's assertion to the contrary this *is* simple, healthy competition. The alternative is that Borden must have intended not to respond when its market share began to disappear,

---

1. The Commission heavily relied on its finding that competitors would have to sell at a price well below that of ReaLemon in order to compete. [1976–1979 Transfer Binder] Trade Reg. Rep. (CCH) at 21,507–21,508; 21,510. This finding is a little hard to accept, in view of the fact that one of Borden's most successful competitors, Minute Maid, apparently charged significantly more for its product than Borden did for ReaLemon.

but not even a monopolist need act so irrationally. *See Telex v. IBM, supra.*

Borden meant to accomplish its marketing goals through extensive advertising and promotions. Advertising is not a use of monopoly power. Successfully promoting one's product is the epitome of the "business acumen" that *Grinnell* states is *not* monopolization. Nor is any monopolization shown by Borden's selective price reductions where there is no finding that the discriminatory pricing violated the Robinson-Patman Act or resulted in Borden's not making a profit. It is simply good business practice, not a use of monopoly power, to lower prices only where the competition is stiff. *See California Computer Products v. International Business Machines Corp.,* 613 F.2d 727, 742–743 (9th Cir. 1979) ("business acumen" includes shrewdness in profitable price competition, which is pricing above average variable cost; the Sherman Act does not distinguish competition on the basis of price and of performance).

The use of monopoly profits derived in one market to subsidize competition in another market, on the other hand, is an unreasonably anti-competitive use of monopoly power. Had the Commission rested its decision here on a finding that Borden used its monopoly profits from some geographic markets to finance the fight against competition in others, there was evidence which might have supported such a Commission decision. However, the FTC found Borden in violation of section 2 because it charged "unreasonably low" prices, and it defined unreasonably low prices as prices so low that the preference for ReaLemon forced competitors to sell at a loss. The Commission expressly stated that a monopolist with an image advantage may not cut prices to eliminate competitors, thus requiring Borden to engage in umbrella pricing, or pricing above cost to protect competitors.[2] The Commission did not ground its decision on any *below* cost pricing or improper use of monopoly profits.[3] Borden's forcing its

2. The Commission adopted the analysis of Professor Scherer, who "find[s] it hard to avoid a value judgment that temporary price cutting to eliminate producers handicapped only by an inferior brand image is socially undesirable." Scherer, "Predatory Pricing and the Sherman Act: A Comment," 89 Harv.L.Rev. 869, 889 (1976). [1976–1979 Transfer Binder] Trade Reg. Rep. (CCH) at 21,509. This is indeed a value judgment, and it has nothing to do with the "use of monopoly power" that section 2 reaches. Whether I agree or disagree with Professor Scherer's value judgment, it has no place here. Despite a rather general assumption to the contrary, section 2 of the Sherman Act is not a license for the courts or the FTC to choose among competing economic theories of the social good and to impose their own ideas of wise economic policy. That is the task of Congress, or arguably the FTC acting as a rule maker under the FTC Act. While broad, the definition of monopolization in section 2 is not quite that broad.

3. The FTC did note that Borden "apparently" made some sales of ReaLemon at prices that were below its average total costs, after agreeing with the ALJ that Borden did not price ReaLemon below average *variable* cost. [1976–1979 Transfer Binder] Trade Reg. Rep. (CCH) at 21,507. Professors Areeda and Turner would find a monopolist that prices its products above average variable cost not guilty of monopolization. Areeda & Turner, "Predatory Pricing and Related Practices Under Section 2

of the Sherman Act," 88 Harv.L.Rev. 697 (1975). Professor Posner would instead find a violation of the Sherman Act when a monopolist sells below average total cost. Posner, *Antitrust Law: An Economic Perspective* 188 (1976). The FTC expressly refused to decide whether Posner or Areeda/Turner correctly defined those pricing practices that constitute monopolization. [1976–1979 Transfer Binder] Trade Reg. Rep. (CCH) at 21,506 n.29. This is understandable since the Commission was concerned with manipulation of a price premium, not below cost pricing.

Absent a decision by the Commission that pricing below average total cost violates section 2 of the Sherman Act, the fact that Borden might have engaged in such pricing has no relevance to this case except, as the Commission used it, to show that Borden's prices were low. This Court cannot take judicial notice that Posner's and not some other economic theory correctly defines the use of monopoly power. In fact, the majority expressly refuses to make such a finding. Thus, the existence of pricing below average total cost does not support the majority's decision.

The Commission also stated parenthetically that Borden subsidized its price cuts in part with continued monopoly pricing elsewhere. *Id.* at 21,508. This statement was made as an aside during the Commission's discussion of Borden's manipulation of its price premium. The statement would only be true if Posner's

competitors to sell at a loss was certainly the paramount if not the only basis for the Commission's decision, and it is the basis the Commission gives for its decision that we must review on appeal. *Securities & Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); majority op. at 506–507. Accordingly, any discussion of below cost sales or use of monopoly profits to subsidize low prices has no place in our review of the case.

On the merits of the decision the FTC did make, neither the majority nor the FTC ever explain why a monopolist may not use consumer preference to its competitive advantage or how this is a use of monopoly power. The majority simply asserts, as did the Commission, that Borden's manipulation of its price premium harmed competition. However, it is the *use* of *monopoly* power, not just an effect on competition or competitive activity by a monopolist, that section 2 prohibits.

The price premium did not exist because of the monopoly. It was nothing more than evidence of a consumer preference for ReaLemon. The preference was created in part by the ReaLemon trademark and in part by successful advertising. The trade-

mark was lawfully acquired by Borden and is protected by federal law. 15 U.S.C. § 1114. Manipulation of a consumer preference is not a use of monopoly power unless the preference was created somehow by the monopoly position in the market, and there is no such finding here. *But, see* Scherer, "The Posnerian Harvest: Separating Wheat from Chaff," 86 Yale L.J. 974, 998 (1977).[4] It is not a violation of the antitrust laws for a monopolist to take advantage of a consumer preference at the expense of its competitors.[5]

The majority may be reasoning that the lawful conduct forbidden by section 2 of the Sherman Act extends beyond a monopolist's unreasonable use of monopoly power to include the use of any market power. The majority opinion is a little ambiguous on this point. If this is the basis of its decision, I think the majority errs in extending the Sherman Act to the otherwise lawful use of market power that is not monopoly power. However, even under this broader test, there is nothing unreasonable about a monopolist's using its image advantage to its benefit.

Because I think the FTC was wrong to premise a violation of section 2 on Borden's

definition of predatory pricing were adopted. Since the Commission did not decide that Posner correctly defined pricing that constitutes a use of monopoly power there is no support for its statement that Borden used its monopoly profits to subsidize the fight against competition. The Commission's offhand statement cannot be the basis for a finding of monopolization.

**4.** The majority cites with approval Joskow and Klevorick, "A Framework for Analyzing Predatory Policy," 89 Yale L.J. 213 (1979). Like Professor Scherer, these commentators would subject the competitive use of an irrational price premium to scrutiny under section 2. Again, like Professor Scherer, their reasons for doing so focus solely on the effect of such a brand preference on competition. As set out below, n.5, I do not believe that it is the function of the FTC to decide which consumer preferences are "rational" and which "irrational." However, the fatal flaw I see in Joskow and Klevorick's analysis is that it ignores the complete legitimacy of a brand preference created by advertising or by being first in the market. This is "business acumen," and its use to affect

competition is not forbidden by section 2 of the Sherman Act.

**5.** The FTC disapproved of the consumer preference for ReaLemon because it resulted from a "spurious" product differentiation based on the strength of the ReaLemon trademark. [1976–1979 Transfer Binder] Trade Reg. Rep. (CCH) at 21,509–21,510. The FTC concluded that there was no rational reason for consumers to pay a premium for the ReaLemon brand name since the product is chemically indistinguishable from other brands of reconstituted lemon juice. *Id.* at 21,508, 21,510. I strongly disagree. The primary function of a brand name is to provide consumers an assurance of quality. It is quite rational for consumers to pay extra for ReaLemon to minimize their risk of receiving inferior goods. Should any proof that this is rational be necessary this case provides a prime example. Borden's principal competitor and the complaining party before the Commission was Golden Crown. The ALJ found and the Commission appears to agree that Golden Crown sold an adulterated product. *Id.* at 21,-501 n.16.

manipulation of its price premium, I would not affirm its decision. I would remand instead for the FTC to decide whether Borden did use monopoly profits from some markets to subsidize competition in other markets.